50 F.3d 1530
 40 ERC 2109
 UNITED STATES of America, Plaintiff,
v.
COLORADO & EASTERN RAILROAD COMPANY, Defendant-Appellant.
FARMLAND INDUSTRIES, INC., Defendant-Appellee,
and
Maytag Corporation, McKesson Corporation, Defendants,
v.
Gary W. FLANDERS; Great Northern Transportation Company,
Third-Party Defendants-Appellants.
 Nos. 94-1041, 93-1422.
 United States Court of Appeals,
Tenth Circuit.
 March 17, 1995.
 
 Wayne B. Schroeder (Ronald L. Fano with him on the brief) of Grimshaw & Harring, P.C., Denver, CO, for appellee.
 Katherine L. Letson (Timothy R. Gablehouse, Joshua B. Epel and Karina M. Thomas with her on the brief) of Gablehouse, Epel & Letson, Denver, CO, for appellants.
 Before ANDERSON, FAIRCHILD*, and BARRETT, Circuit Judges.
 OPINION ON REHEARING
 BARRETT, Senior Circuit Judge.
 
 
 1
 Appellee's petition for rehearing is granted in part. This court's prior opinion, filed November 17, 1994, is withdrawn.
 
 
 2
 Colorado & Eastern Railroad Company (CERC), Great Northern Transportation Company (CERC's holding company) and Gary W. Flanders (CERC's former president and sole shareholder), collectively referred to as "the CERC parties," appeal from the district court's judgment entered June 10, 1993, following trial to the court. In this action filed pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. Secs. 9601, et seq. (1987), the court awarded Farmland Industries (Farmland) $734,058.30 plus interest and costs (Appellants' Appendix, Tab 17, p. 272), as amended on November 5, 1993, awarding Farmland prejudgment interest.
 
 
 3
 From the late 1950's to 1971, Woodbury Chemical Company (Woodbury) operated a pesticide formulation facility at 5400 Monroe Street in Commerce City, Colorado on what is now referred to as the "Woodbury Chemical Superfund Site" (site). In May, 1965, the main Woodbury building was destroyed by fire. Shortly thereafter, Woodbury constructed a new building at the original location. During this time, contaminated debris and rubble from the fire was distributed to various locations at the site, including a 2.2 acre vacant lot directly east of the Woodbury building. In 1968, Farmland purchased a controlling interest in Woodbury. Three years later, in 1971, Farmland sold its interest to McKesson Corporation (McKesson).
 
 
 4
 On September 8, 1983, the site was added to the National Priorities List of hazardous waste sites. In September, 1985, the Environmental Protection Agency (EPA) completed its remedial investigation and feasibility study (RI/FS) for the First Study Area (Unit I), which consisted of the 2.2 acre vacant lot, and found substantial levels of pesticides and metals. The EPA issued a Record of Decision (ROD) on July 19, 1985, specifying remediation measures for cleaning up the site. During pre-design studies, the EPA discovered significant additional contamination west of the 2.2 acre lot. The area of additional contamination (Unit II) included the original Woodbury property and vacant property located west and north of the Woodbury facility which had been purchased by CERC from McKesson in 1984. An amended ROD was issued on September 22, 1986, expanding the site to include all of the CERC property, Unit II. The RI/FS for Unit II was completed and the final ROD was issued in September, 1989.
 
 District Court Proceedings
 
 5
 In October, 1989, the EPA filed suit in the United States District Court for the District of Colorado under CERCLA, 42 U.S.C. Sec. 9607 (Sec. 107), against all known potentially liable parties (PRPs), Farmland, McKesson, CERC, and Maytag Corporation. The United States sought judgment against the defendants, jointly and severally, for all response costs incurred in connection with response actions relating to the site, together with prejudgment interest and costs and for a declaratory judgment jointly and severally against each defendant pursuant to 42 U.S.C. Sec. 9611(g) as to its liability for response costs that will be binding in any subsequent action or actions to recover further response costs at the site.
 
 
 6
 As a result of EPA's suit, Farmland and McKesson entered into a Partial Consent Decree with EPA on September 4, 1990, under which Farmland and McKesson agreed to finance and perform all remediation of the site and to pay $700,000 to EPA for its past response costs. McKesson and Farmland completed all remediation of the site at a cost in excess of $15 million in June, 1992. Included in that figure was $1,439,330 expended for remediation work allegedly caused by the CERC parties' actions at the site.[1]
 
 
 7
 In April, 1992, two months before all remediation of the site was completed, the CERC parties entered into a Consent Decree with the EPA, whereby the CERC parties agreed to pay $100,000 in past EPA response costs.
 
 
 8
 The defendants in the EPA action filed cross-claims against each other, all of which were settled or dismissed before trial except for Farmland's claim against the CERC parties[2] for $734,058.30 pled as (1) cost recovery under CERCLA Sec. 107(a), 42 U.S.C. Sec. 9607(a), or, in the alternative, (2) contribution under CERCLA Sec. 113(f), 42 U.S.C. Sec. 9613(f).[3]
 
 
 9
 Thereafter, the district court granted Farmland's motion for partial summary judgment on the issue of the amount and reasonableness of the "additional" cleanup costs of $734,058.30 Farmland had incurred based upon the alleged CERC "excavation and soil removal activities, refusal to allow access and other actions." United States v. Colorado & Eastern Railroad, 832 F.Supp. 304, 306 (D.Colo.1993). The CERC parties also moved for summary judgment based upon the contention that Farmland's claims were barred by the contribution protection provided by 42 U.S.C. Sec. 9613(f)(2). The district court denied that motion on two bases: (1) that because CERC had not yet paid the $100,000 required by the consent decree entered into with EPA, CERC may not claim protection arising from the decree, and, alternatively, (2) even if CERC were not in default, "... it cannot be said that there is no genuine issue of material fact as to the scope of the contribution protection afforded by CERC's consent decree." Id. at 307.
 
 
 10
 Thereafter, following a two-day trial to the court, the district court entered its "Findings of Fact, Conclusions of Law and Order for Judgment" on June 9, 1993. (Appellants' Appendix, Vol. I, Tab 16, pp. 265-71). The district court made no findings relative to the issue of the CERC parties' contention that Farmland's claims were barred by the contribution protection provided under Sec. 9613(f)(2). The district court concluded, as a matter of law, that Farmland was entitled to recover its response costs of $734,058.30 against the CERC parties, jointly and severally under Sec. 107(a), and that (1) Farmland need not prove causation in order to recover its response costs under Sec. 107(a), (2) the response costs of $734,058.30 were consistent with the National Contingency Plan, (3) liability may be apportioned through Sec. 113(f) contribution actions, but the CERC parties did not counterclaim for contribution, and (4) because the court had held that Farmland was entitled to recover against the CERC parties under Sec. 107(a), it was not necessary to reach Farmland's alternative claim for contribution under Sec. 113(f). Id.
 
 
 11
 On June 10, 1993, the district court entered judgment for Farmland and against the CERC parties in amount of $734,058.30 (Farmland's 51% share of the total "additional" cleanup costs of $1,439,330; McKesson Corporation paid the balance) with interest at the rate of 3.54% per annum. (Appellants' Appendix, Tab 17, p. 272). Finally, on November 5, 1993, upon motion, the court amended the judgment to award Farmland pre-judgment interest in amount of $27,060.00. (Appellants' Appendix, Tab 20, pp. 304-05).
 
 Issues
 
 12
 On appeal, the CERC parties contend that the district court: (1) erred in awarding Farmland cost recovery under a theory of strict liability pursuant to Sec. 107 rather than requiring Farmland to prove causation under Sec. 113(f)(1) and erred in denying them contribution protection under Sec. 113(f)(2); (2) erred in finding that the response costs sought by Farmland were "necessary and consistent" with the National Contingency Plan; and (3) erred in failing to rule on the CERC parties Act-of-God and Act-of-Third-Party defenses.
 
 I.
 
 13
 The CERC parties contend that the district court erred in (1) awarding Farmland cost recovery under a theory of strict liability pursuant to Sec. 107 rather than requiring Farmland to prove causation under Sec. 113(f)(1), and (2) denying them contribution protection under Sec. 113(f)(2). "Causation" in the context of this case means whether CERC caused the increase in the expense of remediation. If it did, that would be an equitable factor for the court to consider under Sec. 113(f)(1). All concerned acknowledge that liability under Sec. 9607 is strict and causation would be irrelevant in that context.
 
 
 14
 Questions of law are considered by this court de novo. Estate of Holl v. Commissioner, 967 F.2d 1437, 1438 (10th Cir.1992). Because this issue on appeal turns on the correct interpretation of the relevant statutory provisions, we are not constrained by the district court's conclusions. FDIC v. Bank of Boulder, 911 F.2d 1466, 1469 (10th Cir.1990), cert. denied, 499 U.S. 904, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991). Thus, the standard of review is the same as that which would be applied by the district court in making its initial ruling. Lilly v. Fieldstone, 876 F.2d 857, 858 (10th Cir.1989).
 
 A.
 
 15
 In its cross-claim, Farmland sought to recover from the CERC parties a part of the cost of remediation of Unit II of the site that was allegedly caused by the CERC parties. Farmland argues that its claim is one to recover costs incurred in the removal of hazardous waste and the remediation of the site under CERCLA Sec. 107; therefore, CERC is strictly liable.
 
 
 16
 The CERC parties contend that the district court erred in allowing Farmland to recover under Sec. 107 since cost recovery between PRPs in these circumstances is a claim for contribution under Sec. 113(f). We agree.
 
 
 17
 CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 99-499, Sec. 101 et seq., 100 Stat. 1613, 1615 (1986), provides two types of legal actions by which parties can recoup some or all of their costs associated with hazardous waste cleanup: cost recovery actions under Sec. 107(a), 42 U.S.C. Sec. 9607(a), and contribution actions under Sec. 113(f), 42 U.S.C. Sec. 9613(f). This appeal requires that we clarify the relationship between cost recovery and contribution actions; specifically, who can recover under each provision.
 
 
 18
 The original CERCLA legislation created the cost recovery mechanism under Sec. 107. This provision makes enumerated parties, PRPs, "liable for ... all costs of removal or remedial action incurred by [government entities]; [and] any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. Sec. 9607(a)(4).
 
 
 19
 Although the broad language of CERCLA has given the courts many challenges, it is now well settled that Sec. 107 imposes strict liability on PRPs for costs associated with hazardous waste cleanup and site remediation. See Farmland Indus. v. Morrison-Quirk Grain, 987 F.2d 1335, 1339 (8th Cir.1993) ("Under 42 U.S.C. Sec. 9607, liability ... for CERCLA response costs is a matter of strict liability"). It is also well settled that Sec. 107 imposes joint and several liability on PRPs regardless of fault. See County Line Inv. Co. v. Tinney, 933 F.2d 1508 (10th Cir.1991); United States v. Chem-Dyne Corp., 572 F.Supp. 802, 809-11 (S.D. Ohio 1983).
 
 
 20
 Due to the impossibility of determining the amount of environmental harm caused by each party where wastes of varying and unknown degrees of toxicity and migratory potential have mixed, the courts have been reluctant to apportion costs between PRPs, and hence have adopted the rule that "damages should be apportioned only if the defendant can demonstrate that the harm is divisible." O'Neil v. Picillo, 883 F.2d 176, 178 (1st Cir.1989) (emphasis original), cert. denied, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); see Tinney, 933 F.2d at 1515 n. 11; Chem-Dyne, 572 F.Supp. at 810.
 
 
 21
 Where defendants bear the burden of proving divisibility, responsible parties rarely escape joint and several liability. O'Neil, 883 F.2d at 178-79. Therefore, CERCLA, as originally enacted, left a PRP faced with the prospect of being singled out as the defendant in a cost recovery action without any apparent means of fairly apportioning CERCLA costs awarded against it to other PRPs. The courts responded to this inequity by recognizing an implicit federal right to contribution where PRPs have been subject to joint and several liability and have incurred response costs in excess of their pro rata share. See Tinney, 933 F.2d at 1515; O'Neil, 883 F.2d at 179; Mardan Corp. v. C.G.C. Music Ltd., 804 F.2d 1454, 1457 n. 3 (9th Cir.1986) ("district courts have interpreted Sec. 107 of CERCLA to impose, as a matter of federal law, joint and several liability for indivisible injuries with a correlative right of contribution") (citations omitted).
 
 
 22
 With the enactment of SARA in 1986, Congress codified this implied right of contribution by amending CERCLA Sec. 113 to expressly recognize a right of contribution. United Technologies Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96, 98 (1st Cir.1994); see 42 U.S.C. Sec. 9613(f)(2). A principal objective of the new contribution section was to "clarif[y] and confirm[ ] the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances." S.Rep. No. 11, 99th Cong., 1st Sess. 44 (1985), reprinted in 2 Legislative History of Superfund Amendments and Reauthorization Act of 1986, 636, Sp. Print 101-120 (101st Cong., 2d Sess.) (1990).[4]
 
 Section 113(f) provides:
 
 23
 (1) Contribution
 
 
 24
 Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) [107(a) ] of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rule of Civil Procedure, and shall be governed by Federal law.
 
 
 25
 (2) Settlement
 
 
 26
 A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.
 
 
 27
 42 U.S.C. Sec. 9613(f)(1)-(2).
 
 
 28
 To resolve contribution claims, Sec. 113(f)(1) continues, "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. Sec. 9613(f)(1). In any given case, "a court may consider several factors, a few factors, or only one determining factor, ... depending on the totality of the circumstances presented to the court." Environmental Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 509 (7th Cir.1992).[5] "Of course, the burden of proof is on the ... party seeking apportionment to establish that it should be granted." H.R.Rep. No. 99-253 (III), 99th Cong. 1st Sess. 19 (1986), reprinted in 1986 U.S.C.C.A.N. 2835, 3038, 3042; see United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1507-08 (6th Cir.1989) (a party is entitled to relief against the other defendant to the extent that it can "demonstrate the divisibility of the harm and that it paid more than its fair share"), cert. denied, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990).
 
 
 29
 In our case, Farmland's claim against the CERC parties must be classified as one for contribution. There is no disagreement that both parties are PRPs by virtue of their past or present ownership of the site; therefore, any claim that would reapportion costs between these parties is the quintessential claim for contribution. See Restatement (Second) of Torts Sec. 886A (1979); Amoco Oil Co. v. Borden Inc., 889 F.2d 664, 672 (5th Cir.1989) ("[w]hen one liable party sues another to recover its equitable share of the response costs, the action is one for contribution, which is specifically recognized under CERCLA" Sec. 9613(f)). Furthermore, were PRPs such as Farmland allowed to recover expenditures incurred in cleanup and remediation from other PRPs under Sec. 107's strict liability scheme, Sec. 113(f) would be rendered meaningless.
 
 
 30
 Whatever label Farmland may wish to use, its claim remains one by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make. Accordingly, we hold, as a matter of law, that Farmland's claim is controlled by Sec. 113(f) and that the district court erred in proceeding under Sec. 107.
 
 B.
 
 31
 The CERC parties claim that they are immune from contribution claims under Sec. 113(f)(1) because they settled their liability with the United States in a judicially approved consent decree pursuant to Sec. 113(f)(2).
 
 
 32
 Farmland argues that the CERC parties are not entitled to contribution protection because (1) the Consent Decree relates only to response costs incurred by the United States which are not the same matters addressed by Farmland's claim, and (2) the $100,000 payment due under the Consent Decree has not been made.
 
 
 33
 The CERC parties contend that (1) Farmland's settlement reduced the amount the United States could legally seek to recover from other parties to the extent that the CERC parties were only liable for any unrecovered response costs of the United States, and (2) unless and until the government decides to rescind its settlement agreement with a private party, a third party has no grounds or authority to invalidate it.
 
 
 34
 Section 113(f) of CERCLA authorizes claims for contribution between PRPs subject to the limitations set forth in paragraph (2). See 42 U.S.C. Sec. 113(f)(2), infra. Thus, a PRP who has entered into a judicially approved settlement with the United States may not be held liable for contribution to another PRP if the contribution claim concerns matters addressed in the settlement.
 
 1.
 Matters Addressed
 
 35
 We turn now to whether the contribution sought by Farmland against the CERC parties is for "matters addressed" in the Consent Decree entered into between the EPA and the CERC parties. The district court did not reach this issue of law, having erroneously concluded that "... Farmland's response costs were consistent with the NCP and therefore recoverable under Sec. 9607(a)." (Appellants' Appendix, Tab 16, pp. 270-71). Previously we have noted that the district court found that there was a genuine issue of material fact as to the scope of the contribution protection afforded by the EPA-CERC parties' Consent Decree. (Appellants' Appendix, Vol. I, Tab 9, p. 236).
 
 
 36
 The statute is silent on how we are to determine what particular "matters" a consent decree addresses. Some courts have used balancing tests. See Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761, 766 (7th Cir.1994) ("Ultimately, the 'matters addressed' by a consent decree must be assessed in a manner consistent with both the reasonable expectations of the signatories and the equitable apportionment of costs that Congress has envisioned."); United States v. Union Gas Co., 743 F.Supp. 1144, 1152 (E.D.Pa.1990) ("Courts must strike a balance between the policy behind CERCLA's contribution provisions and the policy behind the act as a whole."). Other courts have concluded that Sec. 113(f)(2) was intended to encourage settlement while providing settling PRPs with a measure of finality in return for their willingness to settle. See United States v. SCA Services of Indiana, 827 F.Supp. 526, 533 (N.D.Ind.1993) ("in order to further CERCLA's settlement-favoring policy, the court finds that the non-settlors are barred from making claims for contribution against the settlors."); United States v. ASARCO, Inc., 814 F.Supp. 951, 957 (D.Colo.1993) (a cash settlement with the government and approval by the court resolves that party's liability to the United States and, therefore, entitles that party to contribution protection); Avnet, Inc. v. Allied-Signal, Inc. 825 F.Supp. 1132, 1139 (D.R.I.1992) ("Contribution claims against ... [settlors] ... are strictly prohibited by the plain language of the contribution protection provisions of CERCLA.").
 
 
 37
 The CERC-EPA Consent Decree arguably covers two "matters addressed," rather than one: (1) reimbursement of unrecovered response costs of the government (p VI); and (2) a covenant by the government not to sue the CERC parties for any claim asserted in the complaint regarding the whole site. (p VI.A).[6] We have not been presented with an explanation of the failure to draft around the "matters addressed" problem presented by the CERC-EPA Consent Decree.
 
 
 38
 Judge Easterbrook, concurring in part and dissenting in part, in Akzo Coatings, Inc., 30 F.3d at 771, observed:
 
 
 39
 . The consent decree and the covenant not to sue regulate only the settling parties' liability to the United States and to Indiana. How, my colleagues ask, can language so limited extinguish claims by strangers? The answer is: because Sec. 113(f)(2) says so. "A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." Nothing here about resolving liability to private parties; nothing here implying that the consent decree must contain a separate provision blotting out claims by private actors. Aigner fully resolved its liability to the United States. By "resolv[ing] its liability to the United States" Aigner thereby obtained protection from private parties' claims for contribution. Dravo Corp. v. Zuber, 13 F.3d 1222 (8th Cir.1994) (emphasis in original).
 
 
 40
 In this case, we take a fact-specific approach. Laying the two consent decrees (EPA-Farmland and EPA-CERC parties), with incorporated attachments, side by side and comparing the matters covered in relation to the remediation completed by Farmland at the date of the EPA-CERC parties consent decree, we conclude that the real "matter addressed" in the EPA-CERC parties' Consent Decree is the settlement of the CERC parties' liability for the government's past response costs. We conclude that had the CERC parties intended to invoke the contribution bar against Farmland, with full knowledge that Farmland had virtually completed all remediation of the site in satisfaction of the claims set forth in EPA's complaint, they bore the burden of eliminating any doubt that their agreement to pay EPA $100,000 extended that far. We are also aware that with the $100,000 from the CERC parties, EPA's response costs were fully recovered; thus, EPA had nothing to give up by its covenant not to sue, i.e., Farmland had satisfactorily completed almost all remediation of the site at the time the EPA-CERC parties' consent decree was entered into.
 
 2.
 Timing of Contribution Protection
 
 41
 The district court held that the CERC parties' failure to pay the $100,000 required under the consent decree constituted a default which terminated the contribution bar. Colorado & Eastern R.R., 832 F.Supp. at 307. We disagree. Contribution protection is conferred on the settling parties at the time the settling parties enter into the agreement. See Dravco Corp. v. Zuber, 13 F.3d 1222, 1225-28 (8th Cir.1994). The CERC parties are protected from contribution claims "unless and until the EPA rescinds the ... agreement that created the protection from contribution claims." Id. at 1228. "Because only the EPA can rescind, ... any information concerning whether the defendants remain in compliance with the agreement is irrelevant." Id. Accordingly, we hold that whether or not the CERC parties have satisfied their obligations to the United States under their consent decree does not affect Sec. 113(f)(2) contribution protection.
 
 II.
 
 42
 The CERC parties contend that the district court erred in finding the response costs incurred by Farmland were necessary and consistent with the National Contingency Plan (NCP).
 
 
 43
 "Findings of fact ... shall not be set aside unless clearly erroneous." Fed.R.Civ.P. 52(a). "A finding of fact is not clearly erroneous unless 'it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made.' " Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir.1990) (quoting LeMaire ex rel. LeMaire v. United States, 826 F.2d 949, 953 (10th Cir.1987)).
 
 
 44
 The district court found that Farmland's costs were consistent with the national contingency plan based on trial testimony and Title 40 Code of Federal Regulations Sec. 300.700(c)(3)(ii) (1992) which states:
 
 
 45
 Any response action carried out in compliance with the terms of ... a consent decree entered into pursuant to section 122 of CERCLA, will be considered "consistent with the NCP."
 
 
 46
 After a careful examination of the record, we cannot say that the district court's finding is clearly erroneous.III.
 
 
 47
 The CERC parties argue that the district court erred in failing to rule on their Act-of-God and Act-of-Third party defenses.
 
 
 48
 Normally, these defenses would be available to refute PRP status under Sec. 107 which is a prerequisite for Sec. 113 liability. However, in our case, the CERC parties admit their PRP status and Sec. 107 liability. (Appellants' Appendix, Vol. II at p. 357). Therefore, this issue is moot.
 
 Summary
 
 49
 In summary, we hold that (1) claims between PRPs to apportion costs between themselves are contribution claims pursuant to Sec. 113 regardless of how they are pled; and (2) under Sec. 113, contribution claims against settling parties are barred as to "matters addressed" in the settlement which shall be construed broadly to encourage settlement and finalize CERCLA liability for settling parties; in this case, based upon the language in both the EPA-Farmland Consent Decree and the language in the EPA-CERC parties' Consent Decree and the surrounding circumstances, the CERC parties are protected from any contribution claim Farmland may make in regard to its $700,000 payment to the government but not from Farmland's $734,058.30 claim for contribution involving remediation costs allegedly caused by the CERC parties.
 
 
 50
 Accordingly, we AFFIRM IN PART, REVERSE IN PART and REMAND to the district court to consider Farmland's contribution claim under Sec. 113(f) and to apply any equitable factors it determines appropriate.
 
 
 
 *
 The Honorable Thomas E. Fairchild, Senior Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation
 
 
 [1]
 The $1,439,330 represented what Farmland refers to as "additional cleanup costs." Farmland contends that the costs of remediation were increased because of "the spread of contaminated soil as a result of a cut made [allegedly by CERC] in a drainage ditch on the Site, and in removing a vast amount of debris from the Site that accumulated as a result of CERC's failure to fence certain portions of the Site." (Brief for Appellee, p. 8). Apparently the debris had been deposited by third parties who had access because there was no fence
 
 
 [2]
 Farmland joined Great Northern Transportation Company and Gary W. Flanders in its cross-claim against CERC during pretrial proceedings
 
 
 [3]
 Farmland pled a third claim asserting Great Northern Transportation Company and Gary W. Flanders are owner/operators and that they are liable for all debts of CERC. The CERC parties admit that they are all PRPs under Sec. 107; therefore, this issue is moot. (Appellants' Appendix, Vol. II at 357)
 
 
 [4]
 For a detailed discussion of the meaning and history of contribution under Sec. 113(f) see United Technologies Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96 (1st Cir.1994)
 
 
 [5]
 In addition, many courts look to the "Gore Factors", proposed as a moderate approach to joint and several liability by Senator Albert Gore, to apportion contribution claims under Sec. 113(f)(1). We emphasize that the Gore Factors are neither an exhaustive nor exclusive list. The six factors are: (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (ii) the amount of the hazardous waste involved; (iii) the degree of toxicity of the hazardous waste involved; (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (vi) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment. Environmental Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 508-09 (7th Cir.1992)
 
 
 [6]
 Under VI.C & D of the CERC-EPA Consent Decree, the government's covenant not to sue is not to become effective until CERC timely pays the United States $100,000.00