UNITED STATES of America, Plaintiff,

v.

SCOTT'S LIQUID GOLD,
INC., Defendant.

No. 94–B–2082.

United States District Court,
D. Colorado.

Aug. 19, 1996.

Linda A. Surbaugh, Assistant U.S. Attorney, Denver, CO, Robert H. Foster, Environmental Defense Section, Denver, CO, Phillip Brooks, Mariana M. Long, Michael J.

McNulty, Environ. Enforcement Section, Environment & Natural Resources, U.S. Dept. of Justice, Washington, DC, for plaintiff.

Wiley E. Mayne, Steven W. Black, Holland & Hart, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

On September 8, 1994, the United States filed this suit pursuant to sections 107 and § 113(f) of the Comprehensive Environmental Response Act (CERCLA), 42 U.S.C. §§ 9607, 9613(f), for recovery of response costs incurred and to be incurred by the Department of the Army (Army) in connection with the remediation of contamination at the United States Army Rocky Mountain Arsenal (the RMA). Defendant Scott's Liquid Gold–Inc. (Scott's) moves for summary judgment pursuant to Fed.R.Civ.P. 56 on plaintiff United States of America's (the Government) claim for recovery of costs associated with the Klein Water Treatment Facility (the Klein WTF) constructed for the South Adams County Water and Sanitation District. Scott's asserts that the Government's claim is barred by either the six year statute of limitations for § 107 claims found in § 113(g)(2)(B), 42 U.S.C. § 9613(g)(2)(B), or the three year statute of limitations for § 113 claims found in § 113(g)(3). The motion is fully briefed and orally argued. For the reasons set forth in this order, I deny the motion for summary judgment.

## I.

The following facts are not genuinely disputed. The RMA is a federal facility, owned by the United States, and operated by the Army. The United States Environmental Protection Agency (EPA) has listed the RMA on the National Priorities List. The United States' claim for recovery addresses three distinct areas: the On-post area, the Off-post area and the EPA Study Area. The EPA Study Area lies to the west of the RMA. EPA is the "lead agency" for this area. The South Adams County Water and Sanitation District (SACWSD) is at the heart of the EPA Study Area.

From 1981 to 1986 the EPA conducted sampling of the water supply at the SACWSD. The samples revealed the presence of volatile organic compounds (VOCs), principally trichloroethylene (TEC) in the SACWSD wells. The EPA identified the RMA as a source of VOCs in the water supply. On March 20, 1986 the Army signed a cooperative agreement with the EPA allocating one million dollars to the EPA for use in addressing response measures to eliminate the health threat caused by the TCE contamination in south Adams County drinking water. Pursuant to an amendment of the March 20th agreement, in September of 1986 the Army provided the EPA with an additional 6 million dollars in funds to "abate, minimize, stabilize, mitigate or eliminate the threat posed to public health or welfare by TCE in South Adams County drinking water." Defendant's Brief, Exh. 7.

On June 4, 1987, EPA issued a record of decision (ROD) selecting the Klein WTF as a permanent remedial measure for the treatment of SACWSD water. Defendant's Brief, Exh. 6. In October of 1987, the Army entered into a cooperative agreement with EPA and SACWSD for the design and construction of the Klein WTF (the SS/PSA). Pursuant to the SS/PSA, the Army paid SACWSD $289,038 on behalf of the State of Colorado for the construction of the facility, and six million dollars for the operation and maintenance of the facility. The Army paid an additional $975,000 to the EPA to connect users to the Klein WTF. Construction on the Klein WTF commenced on August 15, 1988. It was completed in mid-November 1989.

Scott's facility is south of the RMA. From 1970 through sometime in 1991 Scott's used 1,1,1–trichloroethane (TCA) in its manufacturing process. TCA used in the manufacturing process was stored, at different times in at least two underground tanks. In 1988 or 1989, Scott's discovered TCA, 1,1–discloroethylene (DCE) and other VOCs in the soils and groundwater beneath the facility. In the fall of 1990, pursuant to an agreed order entered into with the Colorado Department of Health, Scott commenced a corrective action to clean-up these VOCs.

In February 1991, Scott's discovered further evidence of VOCs in the soil and groundwater in connection with the removal of 10 underground storage tanks.

The Scott's facility is approximately four miles from a cluster of four groundwater wells operated by SACWSD for the production of drinking water. According to the Government, data reveals that the groundwater from the Scott's facility takes approximately 11 to 14 years to traverse the groundwater pathway to the SACWSD wells. Since 1989 monitoring results from the SACWSD wells have revealed increased levels of 1,1–DCE. Monitoring data from other locations in the aquifer are consistent with a plume of TCA or 1,1–DCE presently migrating towards the SACWSD wells.

## II.

Summary judgment shall enter where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If a movant establishes entitlement to judgment as a matter of law given uncontroverted, operative facts contained in the documentary evidence, summary judgment will lie. *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992). The operative inquiry is whether, based on all the documents submitted, a reasonable trier of fact could find by a preponderance of evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Mares*, 971 F.2d at 494. Summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Mares*, 971 F.2d at 494.

## III.

■ Scott argues that the Government's claim for recovery of costs related to the EPA Study Area is time-barred under either § 113(g)(2)(B) or § 113(g)(3) of CERCLA. Section 113(g)(2)(B) addresses the limitations period applicable to actions to recover re-

sponse costs under § 107(a) while § 113(g)(3) addresses the limitations period applicable to contribution claims among potentially responsible parties (PRPs) pursuant to § 113(f). The initial inquiry is whether this action is one for cost recovery under § 107 or for contribution under § 113(f).

The Tenth Circuit recently addressed in *United States v. Colorado & Eastern Railroad Co.*, 50 F.3d 1530 (10th Cir.1995), whether a PRP may bring an action under § 107 against other PRPs to recover costs. The court held that "claims between PRPs to apportion costs between themselves are contribution claims pursuant to § 113 regardless of how they are pled." *Id. at* 1539. Scott's does not contest that it is a PRP under § 107(a). Moreover, this is clearly an action to apportion response costs between Scott's and the Government. Thus, it is a claim for contribution.

■ Section 113(g)(3) provides:

No action for contribution for any response costs or damages may be commenced more than three years after—(A) the date of judgment in any action under this chapter for recovery of such costs or damages, or (B) the date of an administrative order under section 9622(g) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages. 42 U.S.C. § 9613(g)(3).

Scott's contends that the 1987 Agreement titled "Superfund State/Political Subdivision Agreement" (SS/PSA) triggered § 113(g)(3)(B) because it is the equivalent of a "judicially approved settlement." Scott's argues that the fixing of liability under the SS/PSA activates the running of the statute of limitations. In support of this contention, Scott's cites *Ekotek Site PRP Committee v. Self,* 881 F.Supp. 1516 (D.Utah 1995).

In *Ekotek*, the plaintiff, a corporation composed of 49 PRP corporations, brought an action under § 107(a) against other parties alleged to have contributed to the contamination. After the district court determined that the action was one for contribution under § 113(f), defendants argued that a 1989 Consent Order between the plaintiff and the

EPA qualified as one of the three triggering events under § 113(g)(3) which barred the claim. The district court found that the consent order could only be seen as an order under § 106 which did not qualify under § 113(g)(3). *Id.* at 1522. With respect to § 113(g)(3), the district court stated "Each of these has in common a fixing of the total liability faced by a given settlor. Since his own liability has been fixed by such a settlement, Congress could reasonably conclude that such a settlor may be required to bring any claim for contribution sooner than persons whose liability has not been so fixed." *Id.* at 1523. Here, Scott's asserts that unlike the consent order in *Ekotek* the SS/PSA fixed the liabilities of the parties in 1987, thus, triggering the statute of limitations. I disagree.

 My review of the 1987 SS/PSA leads me to conclude that it merely sets forth the initial distribution of costs associated with the Klein WTF among the participating parties. It does not fix liability. Even if the SS/PSA fixed the liability of the parties, it did not trigger the running of § 113(g)(3)'s limitation period. I agree with the *Ekotek* court's determination that a common factor linking the three events in § 113(g)(3)(B) is the fixing of liability. However, I am not persuaded that the fixing of liability alone is sufficient to activate the statute of limitations. Rather each of the enumerated events under § 113(g)(3)(B) clearly requires additional procedural safeguards to ensure that the settlement is either reviewed by a judge ("judicially approved") or subject to publication in the Federal Register and subject to the notice and comment period (orders under § 122(g) & (h)). Conformance with these procedures provides the requisite finality to the settlement which in turn activates the statute of limitations. Where "the intent of Congress is clear, that is the end of the matter; for the court … must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Section 113(g)(3)(B) is clear on its face. The SS/PSA does not qualify as one of the enumerated events and, therefore, the Government's action is not time barred. *See*

*Reichhold Chemicals, Inc. v. Textron, Inc.,* 888 F.Supp. 1116, 1125 (N.D.Fla.1995); *Gould Inc. v. A & M Battery,* 901 F.Supp. 906, 914 (M.D.Penn.1995).

 Scott's next argues that if the statute of limitations was not triggered by the SS/PSA, there is no applicable statute of limitations and, thus, I must borrow the limitations period of the most closely analogous federal or state statute. To the contrary, where, as here, the statute sets forth a limitations period with specific criteria, I do not look to state law. Instead, I apply the limitations period as mandated by Congress. *See Reichhold Chemicals,* 888 F.Supp. at 1125. The statute of limitations applicable in this case does not bar this action. Consequently, the motion for summary judgment is denied.

Accordingly it is ORDERED that:

Defendant's motion for summary judgment is DENIED.