**In re KAISER GROUP INTERNATIONAL, INC., et al., Debtors.**

**Nos. 00–2263 (MFW) to 00–2301(MFW).**

United States Bankruptcy Court, D. Delaware.

Feb. 7, 2003.

Norman L. Pernick, Esquire, Mark Minuti, Esquire, J. Kate Stickles, Esquire, Saul Ewing Remick & Saul, LLP, Wilmington, DE, G. Christopher Meyer, Esquire, Lynn Rowe Larson, Esquire, Christine Murphy Pierpont, Esquire, Squires Sanders & Dempsey, LLP, Cleveland, OH, for Kaiser Group, International, Inc., et al.

Laurie Selber Silverstein, Esquire, Monica Leigh Loftin, Esquire, Potter Anderson & Corroon, LLP, Wilmington, DE, Asimakis P. Iatridis, Esquire, Vranish & Raisch, LLP, Boulder, CO, for Colorado School of Mines.

Joel A. Waite, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Richard Havel, Esquire, Kevin Lantry, Esquire, Sidley & Austin, Los Angeles, CA, for the Official Committee of Unsecured Creditors.

Charlene D. Davis, Esquire, Elio Battista, Jr., Esquire, the Bayard Firm, Wilmington, DE, Frederick D. Holden, Jr., Esquire, Jeffredy D. Hermann, Esquire, Brobeck, Phleger & Harrison, LLP, San Francisco, CA, for the Retirees Committee.

### MEMORANDUM OPINION [1]

MARY L. WALRATH, Bankruptcy Judge.

Before the Court is the Motion to Estimate the Claim of the Colorado School of

---

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant

Mines ("CSM") filed by Kaiser Group International and various related entities ("the Debtors"). Although CSM originally opposed the Motion and sought relief from the stay to liquidate its claim elsewhere, CSM has now agreed to allow this Court to estimate its claim. For the reasons set forth below, we estimate CSM's claim at $3,985,276.16.

## I. FACTUAL BACKGROUND

Located on the south side of Clear Creek in Golden, Colorado ("the Site") is a defunct mining research center ("the Center") established in 1912 and in operation until 1987. The Colorado School of Mines Research Institute ("CSMRI") was established in 1949 to maintain the Center.[2] The Center provided research and development services to the mineral industries and to various governmental agencies on a contractual basis. Entities sponsoring projects at the Center ("Research Sponsors") would send or bring their own minerals and/or ores to the Site. Buildings, laboratories, and equipment were present at the Center; however, many Research Sponsors purchased and/or constructed their own buildings, laboratories, and equipment. Costs associated with disposal of waste generated by the research were borne by the Research Sponsor, who designated the manner in which disposal was to take place. The Debtors and/or their predecessors were Research Sponsors at the Center.

In the early 1950s, CSMRI established a settling pond at the Center to collect wastes. All building drains fed directly into that pond. In January 1992, a City of Golden water main broke under Building 109 on the Site. The large quantity of water released by the break filled the settling pond, which overflowed into Clear Creek, a source of drinking water for the area. The flooding also weakened the pond dikes. At the time, the Agency for Toxic Substances and Disease Registry determined that the overflow posed no adverse health risk to the public drinking supply. However, due to the weakening of the pond dikes, the on-scene representative of the United States Environmental Protection Agency ("the EPA") concluded that approximately 22,000 cubic yards of soils in and around the settling pond needed to be excavated and removed from the Site due to contamination by radionuclides[3] and other hazardous substances. The EPA investigation of the 17 buildings at the Site also found radionuclide and metal contamination. On December 15, 1994, the EPA issued a Unilateral Administrative Order ("UAO") to CSM, among others, ordering the permanent off-site disposal of the excavated materials. CSM has incurred costs in excess of $3,913,586.27 in complying with the UAO. CSM also faces future response costs as radionuclides were detected in 1999 in excess of safe levels in groundwater and subsurface soils, and additional investigations are ongoing.

In September 1999, CSM brought an action in the United States District Court for the District of Colorado ("the Colorado Action") against more than 200 defendants, including the Debtors, seeking to recoup

to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

**2.** It is unclear from the record whether the Center was owned and previously operated by CSM or by the State of Colorado.

**3.** Radionuclides are radioactive nuclides. "Nuclide" is a general term referring to all known isotopes, both stable (279) and unstable (about 5,000), of the chemical elements.

the costs expended by CSM in remediating the Site. Many of the defendants have settled; the Debtors have not.

On June 9, 2000, the Debtors filed voluntary Chapter 11 petitions in this Court. On July 24, 2000, CSM filed a Proof of Claim in the amount of $3,693,615.97, plus interest and future costs. Accounting for future costs, CSM now seeks an aggregate total of $5,235,276.16. The Debtors, however, estimate the claim to be between $22,102 and $40,000. Pursuant to section 502(c) of the Bankruptcy Code, the parties ask us to estimate the claim to avoid protracted litigation and the resultant expenses.

## II. *JURISDICTION*

This Court has jurisdiction over this matter, which is a core proceeding, pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B), and (O).

## III. *DISCUSSION*

CSM's claim is for recovery of its past and future costs related to cleanup of environmental contamination at the Site under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Solely for purposes of this Motion, the Debtors stipulate that they are liable to CSM, but dispute the amount of their liability and under which section of CERCLA CSM may recover.

### A. *CERCLA*

CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), provides two types of legal actions by which parties can recoup some or all of their costs associated with hazardous waste cleanup: cost recovery actions under section 107(a) and contribution actions under section 113(f).

*U.S. v. Colorado & Eastern Railroad Co.,* 50 F.3d 1530, 1535 (10th Cir.1995).

Section 107(a) of CERCLA states: Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan.

42 U.S.C. § 9607(a). CERCLA was enacted with two principal goals in mind: "to facilitate the cleanup of potentially dangerous hazardous waste sites and to force polluters to pay the costs associated with their pollution." *U.S. v. CDMG Realty Co.,* 96 F.3d 706, 717 (3d Cir.1996) (internal citations omitted). The scope of Sec-

tion 107(a) has been the subject of numerous cases.

Although the broad language of CERCLA has given the courts many challenges, it is now well settled that § 107 imposes strict liability on [potentially responsible parties ("PRPs")] for costs associated with hazardous waste cleanup and site remediation. It is also well settled that § 107 imposes joint and several liability on PRPs regardless of fault. Due to the impossibility of determining the amount of environmental harm caused by each party where [as here] wastes of varying and unknown degrees of toxicity and migratory potential have mixed, the courts have been reluctant to apportion costs between PRPs, and hence have adopted the rule that 'damages' should be apportioned only if the *defendant* can demonstrate that the harm is divisible.

*Colorado & Eastern Railroad*, 50 F.3d at 1535 (citations omitted) (emphasis in original).

As a result of the burden under section 107(a), defendants were rarely able to avoid joint and several liability and frequently one defendant was obligated to pay the entire amount in a cost recovery action. As originally drafted, CERCLA did not expressly provide that any defendant could seek contribution from other PRPs, although courts recognized an implicit federal right to contribution. *Id.* That implicit right of contribution was codified in section 113 with the enactment of SARA.

Section 113(f)(1) permits "any person [to] seek contribution from any other person who is liable or potentially liable under section [107(a)]." 42 U.S.C. § 9613(f)(1). However, section 113(f)(2) provides that parties who settle with the United States or a State may *not* be sued by the other defendants for contribution.

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

42 U.S.C. § 9613(f)(2). A settling party may, nonetheless, seek contribution from the non-settling PRPs for the amount paid by it in its settlement.

A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

42 U.S.C. § 9613(f)(3)(B).

■ Section 113(f)(2) "was intended to encourage settlement while providing settling PRPs with a measure of finality in return for their willingness to settle." *Colorado & Eastern Railroad*, 50 F.3d at 1537. Specifically, "SARA's modifications encourage the efficient resolution of environmental disputes by creating a settlement system in which potential damages increase dramatically for parties who refuse to settle." *In re Reading Company*, 115 F.3d 1111, 1119 (3d Cir.1997). Thus, SARA promotes the goals of CERCLA by encouraging prompt remediation of environmental harm. In exchange for reaching a settlement with the government and engaging in the prompt cleanup of a site, a party receives a known cap on its own liability and the statutory authority to seek recoupment of its costs from other polluters, secure in the knowledge it is immune from contribution claims against it.

■ Though it may seem harsh, "settling PRPs gain protection from contribution, enjoy potentially favorable settlement terms, and retain the ability to seek contribution from other defendants. In contrast, non-settling PRPs are barred from seeking contribution from the settling parties and thereby face potentially disproportionate liability." *Raytheon Constructors, Inc. v. ASARCO Inc.*, 2000 WL 1635482, *29 (D.Colo. March 31, 2000) *citing Reading Company*, 115 F.3d at 1119.

In the Colorado Action, CSM asserted it was entitled to recovery from the Debtors under both section 107 and section 113. The advantage derived from proceeding under section 107 is that a party is able to recover all costs expended, while proceeding under section 113 limits a party to recovery of costs expended in excess of its fair share. Section 113, by its terms, permits the court to allocate response costs among all PRPs. Given the difference between the potential full recovery under section 107(a) and partial recovery under section 113, CSM obviously seeks recovery under section 107(a) in the first instance.

## B.  *Section 107(a) of CERCLA*

■ CSM asserts that it is entitled to proceed under section 107(a) on two grounds. First, it asserts that it is an arm of the State.[4] As such, CSM contends that it has sovereign immunity under the Eleventh Amendment of the United States Constitution.[5] The Debtors dispute this

contention and assert that by voluntarily filing a claim in bankruptcy court, a State waives its Eleventh Amendment immunity. *Gardner v. New Jersey*, 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504 (1947). We agree and conclude that, even if CSM were a governmental entity, it has waived any sovereign immunity by filing a proof of claim and consenting to determination of the amount of its claim in this Court.

CSM also asserts that, even if it is not found to have sovereign immunity, it is entitled to proceed under section 107(a) because it is a governmental entity. The Debtors assert that CSM is also a PRP and that PRPs, whether governmental or private, are unable to maintain claims under section 107.

### 1.  *Can a governmental PRP bring a Section 107 action?*

■ CSM asserts that a governmental entity may maintain a section 107 action "even where the government agencies themselves are deemed PRPs." *See, e.g., United States v. Friedland*, 152 F.Supp.2d 1234, 1249 (D.Colo.2001). *But see, United States v. Scott's Liquid Gold, Inc.*, 934 F.Supp. 362, 364 (D.Colo.1996) (as a PRP, the United States Army's claim against another PRP was a claim for contribution under section 113). For the reasons set forth below, we decline to follow *Friedland* and do not believe CSM should be permitted to proceed under section 107 solely by

---

**4.** Article VIII, section 5 of the Colorado State Constitution reads: "The following educational institutions are declared to be state institutions of higher education: The university at Boulder, Colorado Springs, and Denver; the university at Fort Collins; the school of mines at Golden." COLO. CONST. ART. VIII, § 5. *See also Sturdevant v. Paulsen*, 218 F.3d 1160, 1170 (10th Cir.2000) ("we have consistently held that state colleges and universities are arms of the state").

**5.** The Eleventh Amendment provides that "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

virtue of its status as a governmental entity.

The Third Circuit has addressed this issue and concluded that a governmental entity may not maintain a section 107(a) action if it is a PRP:

> Every court of appeals that has examined this issue has come to the same conclusion: a section 107 action brought for recovery of costs may be brought only by *innocent* parties that have undertaken clean-ups. An action brought by a potentially responsible person is by necessity a section 113 action for contribution. *See Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir.1996); *United States v. Colorado & Eastern R.R. Co.,* 50 F.3d 1530, 1536 (10th Cir.1995); *United Technologies Corp. v. Browning–Ferris Indus., Inc.,* 33 F.3d 96, 99 (1st Cir.1994); *Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761, 764 (7th Cir.1994); *see also Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1989). We agree with the conclusion reached by our sister courts.

*New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1120 (3d Cir.1997) (emphasis in original).

The Tenth Circuit has held that where both parties are PRPs "any claim that would reapportion costs between these parties is the quintessential claim for contribution. Furthermore, were PRPs ... allowed to recover expenditures incurred in cleanup and remediation from other PRPs under § 107's strict liability scheme, § 113(f) would be rendered meaningless." *Colorado & Eastern Railroad,* 50 F.3d at 1536 (citation omitted). The Court went on to state that "[w]hatever label Farmland may wish to use, its claim remains one by and between jointly and severally liable parties for an appropriate division of the payment one of them has been com-

pelled to make. Accordingly, we hold, as a matter of law, that Farmland's claim is controlled by § 113(f)." *Id. See also Sun Company, Inc. v. Browning–Ferris, Inc.,* 124 F.3d 1187, 1193 (10th Cir.1997)(a "government entity or a party who did not contribute to the waste may recover all of its expenditures in a traditional § 107(a) 'cost recovery' action against any PRP.... A PRP who contributed to the waste may recover a portion of the costs it expended in cleaning up the site in a contribution action under § 113(f)"); *United Technologies Corporation v. Browning–Ferris Industries, Inc.,* 33 F.3d 96, 103 (1st Cir.1994)("CERCLA's text indicates that contribution and cost recovery actions are distinct, non-overlapping anodynes").

Even if there were not controlling precedent in our Circuit on this point, we would not find *Friedland* compelling. First, the decision on this issue is dicta. In *Friedland,* the third-party plaintiff sought a determination that the United States was limited to an action for contribution under section 113 because it was an owner for CERCLA purposes. *Friedland,* 152 F.Supp.2d at 1237. After undertaking a detailed analysis of the "unique form of property" that is an unpatented mining claim, the Court concluded that the United States was not an "owner" for purposes of CERCLA liability. *Id.* at 1246.

Further, the rationale of the *Friedland* Court for permitting the United States to recover under section 107 is not applicable here:

> the Court recognizes that this finding relies upon an understanding of the United States government's unique role: through the EPA it is responsible for enforcing CERCLA and recovering response costs to protect the public fisc. At the same time, there are governmental agencies who are themselves PRPs. If the government were a private party

in this same factual situation, it would only be able to avail itself of a claim for contribution. However, the government's role in the enforcement of CERCLA is greater than that of a mere private party. Allowing the government to impose joint and several liability is in harmony with the overall policy aims of CERCLA.

*Friedland,* 152 F.Supp.2d at 1249.

In this case, however, CSM lacks the unique dual role of the United States government in the *Friedland* case. Here, CSM is not acting in both the environmental enforcement role and a PRP role. The environmental enforcement role was undertaken by the United States, not CSM. Therefore, we conclude that *Friedland* is distinguishable and does not compel us to ignore binding Third Circuit authority (or the persuasive authority of the numerous other Circuits) on this issue. We consequently conclude that a governmental entity, if it is a PRP, may not proceed under section 107(a) but is limited to seeking contribution under section 113.

### 2. *Is CSM a PRP?*

■ Having concluded that CSM may not proceed under section 107 if it is a PRP, we next address the question of whether CSM is, in fact, a PRP. As noted above, section 107(a)(2) subjects to liability "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Section 101(20)(A)(ii) does not elucidate the issue since it defines the term "owner or operator" to mean simply "any person owning or operating [a] facility." The Supreme Court has shed light on the term "operator" in the following manner: "for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *United States v. Bestfoods,* 524 U.S. 51, 66–67, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).

Though it has attempted to portray itself as a wholly innocent party, the evidence clearly establishes that CSM itself was a Research Sponsor. According to CSMRI's annual reports, CSM was the sponsor of nine projects: three in 1958, two in 1961, and one in 1969, 1976, 1977, and 1978. In its 1992 response to an EPA information request, CSM admitted sponsoring three projects at the Center: Electrostatic Separator, Sample Crushing, and Coal Industry Review Lecture. Although there is little detail about what those projects were, we can assume that the Sample Crushing project performed at the Site crushed some type of rock.[6] Thus, it is not too much to conclude that at least one of the CSM's projects involved the disposal of hazardous substance or dust.

This conclusion is supported by the assertions of CSM with respect to the activities of other Research Sponsors. CSM states in its Objection to the Debtors' Motion to estimate its claim that "when Research Sponsors jointly participated with others in performing their research pro-

---

**6.** Unfortunately, according to CSM, the project files appear to have been lost. We are not persuaded by CSM's assertion that, since the files have not been located, we can conclude that the projects never progressed beyond the proposal stage or were performed at a site other than the Center. This is contra- dicted by evidence that the 1958 CSM-sponsored project "Colorado Coal Studies" was the 12th most expensive project (of 163 total projects) sponsored that year. As costly as the project was, we conclude that the project must have resulted in some form of disposal of hazardous material.

jects, or directed others to perform certain tasks on their research activities, they personally engaged themselves in the activities that generated the hazardous substances at issue and they have operator liability." CSM asserts that this conclusion is supported by the "commonly accepted scientific fact that all rocks and soils contain radionuclides.... Therefore all research materials left at the Site by [Research Sponsors] contained CERCLA hazardous substances and contributed to the harm." Finally, CSM asserts that the Research Sponsors "knew some disposal of mining materials [and thus hazardous substances] would result from the research on its ores: whether it be by dust through crushing and grinding; testing that provided water borne waste and discharge into the settling pond; testing that required various chemicals; or disposal of their ores at the conclusion of their research project." [7]

Based on CSM's own assertions, we can easily conclude that as a Research Sponsor itself, CSM "personally engaged ... in the activities that generated the hazardous substances at issue and [it has] operator liability." Consequently, we conclude that CSM is a PRP. Its claim, therefore, is limited to one for contribution pursuant to section 113.

### C. Application of Section 113

■ As noted above, liability for each PRP is strict, joint, and several. *See, e.g., Colorado & Eastern Railroad,* 50 F.3d at 1535. The Debtors are statutorily barred from asserting counterclaims against CSM for contribution. 42 U.S.C. § 9613(f)(2). CSM, however, may seek contribution

from the Debtors for their fair share of the remediation costs. *Id.* at 9613(f)(1).

Complicating the issue before us as we attempt to estimate CSM's claim are orphan shares: "response costs attributable to insolvent or defunct PRPs at a site, which are unable to be recovered." *Centerior Service Co. v. Acme Scrap Iron & Metal Corp.,* 153 F.3d 344, 354 n. 12 (6th Cir.1998) (internal citation omitted). "Parties held jointly and severally liable for a site cleanup initially shoulder the burden of orphan shares. Yet when the parties seek contribution from other PRPs, the district court ... may apportion the amount of the orphan shares among the parties." *Id.* Authority to apportion orphan shares among the parties derives from section 113(f)(1): "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Thus, "in any given case, a court may consider several factors, a few factors, or only one determining factor, ... depending on the totality of circumstances presented to the court." *Environmental Transp. Systems, Inc. v. ENSCO, Inc.,* 969 F.2d 503, 509 (7th Cir.1992). *See also Morrison Enterprises v. McShares, Inc.,* 302 F.3d 1127, 1135 (10th Cir.2002) ("there may be 'orphan shares' of liability for bankrupt or judgment-proof defendant PRPs that should equitably be divided among the plaintiff and other defendant PRPs"); *Sun Company,* 124 F.3d at 1193 ("under § 113(f) ... liability will be several, and the total cleanup costs—including responsibility for 'orphan shares'—will be equitably apportioned among all the PRPs, with the court being able to consider any

---

**7.** CSM also asserts that, since Research Sponsors leased space at the Center, they are also liable as "owners." Finally, CSM asserts that, by arranging for their research materials to be brought to the Center, the Research Sponsors are liable under CERCLA as "arrangers" as well. We need not decide these issues as they pertain to CSM, since we readily conclude CSM is an operator as that term is used in CERCLA.

factors it deems relevant"); *Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298, 1303 (9th Cir.1997) ("Immunizing PRPs who have directly paid for cleanup operations from the risk of sharing the cost associated with orphan shares would undermine the ability of courts to allocate costs between all PRPs").

CSM argues it should be awarded the full amount of its claim of $5,385,276. It argues that awarding the total amount would be in accord with the legislative intent of CERCLA and judicial interpretations of the statute because it would reward CSM for its early settlement with the United States and its remediation of the Site, while disproportionately and punitively shifting the liability to the Debtors. It asserts that assessing the Debtors a share of the costs associated with the remediation of the Site in an amount less than the total amount sought by CSM would, in its view, both unjustly reward the recalcitrant Debtors and, at the same time, punish CSM by saddling it with bearing the burden of the cleanup costs, including the risk it will not be able to recover from the other defendants.

The Debtors argue on the contrary that they should not be punished for their failure to settle or otherwise deal with CSM's claim earlier. Since they filed their chapter 11 petitions, the action by CSM has been stayed. Until they could reach consensus with all their creditors and their plan of reorganization could be confirmed, the Debtors argue it was not appropriate for them to settle or pay the CSM claim. Therefore, they assert that they should not be penalized for taking advantage of the "breathing space" afforded them by the Bankruptcy Code.

Although the Debtors are correct that the automatic stay precluded them from paying the CSM claim, it did not preclude them from seeking to settle and liquidate the amount of that claim before confirmation of their plan. In fact, given the large amount of the claim, it is surprising that the Debtors did not attempt to resolve the claim earlier. (The Debtors' Plan of Reorganization was confirmed and substantially consummated approximately 27 months ago.)

The Debtors also argue that their contribution should be limited to the amount of hazardous materials they actually generated at the Site. According to CSM's proof of claim, the Debtors contributed approximately 107,000 pounds of the total 24 million pounds of hazardous material deposited at the Site. Thus, the Debtors assert their contribution should be only .44% of the total costs of cleaning up the hazardous wastes at the Site (or approximately $22,000 to $40,000). However, the most recent calculation of the amount of material deposited by the Debtors is substantially higher.[8]

■ We need not determine exactly how much the Debtors deposited, however, because we cannot conclude as the Debtors argue that they should only pay the costs attributable to their portion of the hazardous wastes. As the Debtors are strictly, jointly, and severally liable for the entire cost of the cleanup, and statutorily barred from asserting a counterclaim against CSM for contribution, it would be contrary to CERCLA jurisprudence for us to value the claim only in the amount that the Debtors actually deposited. If that were the only amount that a PRP would be

---

**8.** CSM has since asserted that the Debtors actually contributed between 1.3 million and 20.69 million pounds. However, CSM has never sought to amend its initial claim. *See*

*Holstein v. Brill,* 987 F.2d 1268, 1270–71 (7th Cir.1993) (claims may only be amended before confirmation of a plan of reorganization).

required to contribute to another PRP, there would be no incentive for anyone to remediate a site or to settle early.

■ However, we are also not inclined to award CSM a claim for the entire amount sought by it for several reasons. First, under the Bankruptcy Code, CSM's claim must be disallowed to the extent that it seeks to recover future costs. Section 502(e)(1) provides that: "The court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured, the claim of a creditor, to the extent that ... such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution." 11 U.S.C. § 502(e)(1). Since the parties have asked us to estimate the claim at this time, we will not include future unknown costs in the calculation.

With respect to the allocation of the actual costs expended by CSM, however, there is considerable uncertainty about the amount of orphan shares. While CSM asserts that it has collected all it can from the other PRPs, we note that several of the settlements were reached by it only recently.[9] It is therefore unclear whether the total amount outstanding represents costs unable to be recovered or costs which have just not yet been recovered. Consequently, we cannot conclude that the Debtors are the last recalcitrant defendants.

Furthermore, the fact that CSM was also a contributor to the Site convinces us that we need not assure that they recover all that they have spent in remediation from these Debtors. *See, e.g., United*
*States v. Cannons Engineering Corp.*, 899 F.2d 79, 91 (1st Cir.1990) (a settlement does not, however, permit a settling PRP to escape scot-free, via indemnification by so-called "recalcitrant" PRPs).

■ It is significant, however, that, because of the Debtors' bankruptcy, CSM will *not* receive payment of the full amount of its claim, even if we allow it in the full amount. In fact, under the confirmed plan, the Debtors estimate that CSM will only recover approximately 9.6% of any claim allowed. Based on this, as well as all the above factors, we conclude that the claim of CSM against the Debtors should be estimated in the full amount of the costs already incurred by CSM for which it has not received reimbursement. CSM's initial claim against the Debtors was $3,693,615.97 which included actual costs incurred through February 2000, interest and an estimate of future costs. CSM has recovered at least $453,818.81 in settlements with other PRPs and incurred $745,479 in actual additional costs. In calculating its claim against the Debtors of $5,235,276.16, CSM estimated future costs of $1,250,000 (which are not allowable pursuant to section 502(e)(1)). Eliminating the future costs, leaves $3,985,276.16 which we estimate as the amount of CSM's claim.

## IV. CONCLUSION

For the foregoing reasons, we estimate the claim of CSM against the Debtors at $3,985,276.16.

9. Unfortunately, we were not presented with a succinct breakdown of which defendants have settled, the amount of those settlements, their respective shares of waste contributed to the Site, or the expected amount of the orphan shares. CSM asserts it has only recovered approximately 12% of its response costs to date. We do not believe that the remainder of the response costs are all attributable to the Debtors or to orphan shares as opposed to what can be recovered from the other defendants in the Colorado Case.