CITY OF WICHITA, Plaintiff,

v.

AERO HOLDINGS, INC.,
et al., Defendants.

No. 98–1360–MLB.

United States District Court,
D. Kansas.

July 28, 2000.

1154

Robert L. Driscoll, Richard L. Green, Douglas Y. Curran, Brian D. Williams, Joan K. Rowland, Stinson, Mag & Fizzell, P.C., Kansas City, MO, Joe A. Lang, Gary E. Rebenstorf, Wichita, KS, for Plaintiff.

John M. Waldeck, Niewald, Waldeck & Brown, P.C., Kansas City, MO, G. Craig Robinson, Vernon D. Just, Carl N. Kelly, Wichita, KS, John K. Power, Jerry D. Rank, Leonard L. Wagner, Husch & Eppenberger, Kansas City, Ted E. Knopp, Ted E. Knopp, Chartered, Alexander B. Mitchell, II, Klenda, Mitchell, Austerman & Zuercher, L.L.C., Charles C. Steincamp, Depew and Gillen, L.L.C., Wichita, KS, Dale F. Conde, Conde, Killoren, Bueschel & Calgaro, Rockford, IL, Gary A. Gorman, Gorman Law Office, Shannon A. Kelly, Kelly Law Offices, Kurt A. Harper, Sherwood & Harper, Calvin L. Wiebe, David G. Crockett, Crockett & Gilhousen, Van Russell Delhotal, Wichita, KS, John P. Jennings, Teresa A. Woody, Spencer, Fane, Britt & Browne, Kansas City, MO, Kasey A. Rogg, Martin & Churchill Chartered, Wichita, KS, Randy J. Curato, Neal H. Weinfield, Jeffrey B. Aaronson, Bell, Boyd & Lloyd, Chicago, IL, Richard E. Hill, Bell, Boyd & Lloyd, Washington, DC, Ross A. Hollander, Joseph & Hollander, P.A., Wichita, KS, Dennis S. Boxeur, Nash, Cohenhour, Kelley & Hunt, P.C., Oklahoma City, OK, Matthew E. Turner, Shook, Hardy & Bacon L.L.P., Kansas City, MO, Bill J. Hays, Shook, Hardy & Bacon L.L.P., Overland Park, KS, Richard C. Hite, Richard L. Honeyman, Dennis V. Lacey, Hite, Fanning & Honeyman L.L.P., Stephen E. Robison, Charles E. Millsap, Stephen M. Stark, William P. Tretbar, Scott D. Jensen, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, Charles P. Efflandt,

**1158**

Robert J. McCully, Foulston & Siefkin L.L.P., Wichita, KS, for Defendants.

William D. Brighton, U.S. Department of Justice Environment & Natural Resources Division, Environmental Enforcement Section, Washington, DC, for Amicus.

Jeff C. Spahn, Jr., Martin, Pringle, Oliver, Wallace & Spikes, L.L.P., Wichita, KS, Douglas Y. Curran, Stinson, Mag & Fizzell, P.C., Kansas City, MO, for Movants.

Gordon Kratz, Loves Park, IL, Pro se.

Tri–State Laundry & Dry Cleaners Supply, Inc., Attn: Lindon Ford R & R Manufacturing & Supply, Inc., Oklahoma City, Pro se.

## MEMORANDUM AND ORDER

BELOT, District Judge.

Plaintiff City of Wichita (City) brings this private party action against twenty-seven[1] defendants pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, as amended by the Superfund Amendments and Reauthorization Act (SARA) of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (1986). The City seeks to recover response costs incurred in cleaning up groundwater contamination near the center of Wichita pursuant to CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B). The City alternatively seeks contribution from defendants pursuant to CERCLA § 113(f), 42 U.S.C. § 9613(f). The City also seeks declaratory relief that defendants are responsible for future response costs. According to allegations in the complaint, the harm resulting from the groundwater contamination is indivisible. (Complaint (Doc. 1) at ¶ 17).

The case is currently before the court on defendants' motions for summary judgment on two strategic issues impacting how, and whether, this litigation will proceed. In a joint motion (Doc. 553), all defendants seek summary judgment on the City's § 107(a) claims. Defendants contend the City itself is a potentially responsible party (PRP), as defined by § 107(a)(1)-(4), and is therefore prohibited by Tenth Circuit precedent from bringing any claim other than one for contribution. Defendants also seek summary judgment on all of the City's claims based on CERCLA's statute of limitations, CERCLA § 113(g), 42 U.S.C. § 9613(g).[2] For the reasons discussed in this opinion, defendants' motion for summary judgment on the § 107(a) claims is sustained; defendants' statute of limitations motion is overruled. This case will proceed as a contribution action.

## I. SUMMARY JUDGMENT STANDARDS

The usual and primary purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Fed.R.Civ.P. 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine" if sufficient evidence exists on

---

**1.** Pending before the court is the City's and Vulcan Materials Company's joint motion for approval of settlement (Doc. 577). Some of the other defendants have opposed the settlement.

**2.** All defendants except Thomas Dizerega and John McMillian, Trustees of the Apco Oil Corporation Liquidating Trust ("APCO defendants"), joined in a motion for summary judgment (Doc. 530) on the statute of limitations issue. *See* doc. 531 (memorandum in support of defendants' joint motion for summary judgment). The APCO defendants filed a separate motion for summary judgment. (Doc. 542).

each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citations omitted).

The moving party initially must show both an absence of a genuine issue of material fact, as well as entitlement to judgment as a matter of law. *See id.* at 670. The nature of the showing depends upon whether the movant bears the burden of proof at trial with the particular claim or defense at issue in the motion. If the nonmoving party bears the burden of proof, the movant need not "support its motion with affidavits or other similar materials *negating* the opponent's" claims or defenses. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (emphasis in original). Rather, the movant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of the nonmovant's claim. *Adler*, 144 F.3d at 671 (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). On the other hand, if the movant has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim or defense. *See, e.g., United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc).

Once the moving party properly supports its motion, the burden shifts to the nonmoving party, "who may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Muck v. United States*, 3 F.3d 1378, 1380 (10th Cir.1993). In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir.1994). A party opposing summary judgment "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir.1988). Put simply, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In the end, the court must determine "whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Accordingly, the court must review the "factual record and reasonable inferences therefrom in the light most favorable to the nonmoving/opposing party." *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 851 (10th Cir.1996); *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2514. If sufficient evidence exists on which a trier of fact could reasonably find for the non-moving party, summary judgment is inappropriate. *Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 684 (1991).

## II. *FACTS* [3]

### A. *HISTORY OF THE GILBERT & MOSLEY SITE*

The contaminated area located near Wichita's center is commonly referred to

---

**3.** The parties stipulated to many of the facts relevant to the issues addressed in this opin-

as the Gilbert & Mosley site (the "Site"). The Site is named after the intersection of Gilbert Street and Mosley Street, which lies near the middle of the contaminated area. The boundaries of the Site have been delineated through a series of investigations conducted by the Kansas Department of Health and Environment (KDHE) and others since 1986. The area encompasses roughly four and a half miles from north to south, varies in width from one to two miles east to west, and covers around 3,850 acres of an industrial area in Wichita's downtown. Approximately 8,000 parcels of land are ensnared within its boundaries. The City itself owns over 400 properties within the Site.

KDHE first detected volatile organic compounds (VOCs) in the groundwater at a facility located within the Site in 1986. Through a Cooperative Agreement with the United States Environmental Protection Agency (EPA), KDHE conducted investigations of potential and actual contamination in accordance with CERCLA. In a November 1989 report to the EPA, KDHE recommended that a Listing Site Investigation (LSI) be conducted for evaluation of whether the Site should be included on the EPA's National Priority List (NPL) of Superfund sites. (Doc. 532, Ex. B, "Preliminary Assessment and Scanning Site Investigation"). The LSI was undertaken and finalized in an August 1990 report. The major hazardous contaminants discovered during the LSI were chlorinated solvents which are commonly used by many businesses as cleaning and degreasing agents. The four main contaminants found were perchloroethylene (PCE), trichloroethylene (TCE), 1,2–dichloroethylene (DCE) and vinyl chloride. Multiple sources of groundwater contamination

were identified, including the Coleman Company's (Coleman's) downtown Wichita facility (CDWF). In the LSI report, KDHE identified over 500 PRPs. The City was not identified as a PRP. (Doc. 562 at ¶ 8).

## B. THE AGREEMENTS

The groundwater problems identified by KDHE, and the potential for inclusion of the Site on the NPL, hindered business development and investment within the Site, lowered property values and eroded or threatened to erode the City's tax base. In an attempt to address the threat to public health and the environment, and to avert further economic problems, the city council approved a unique and comprehensive agreement with KDHE in March 1991 which provides that the City will perform a remedial investigation and feasibility study (RI/FS).[4] The City is also obligated to undertake remedial activities ultimately identified in the RI/FS, following an opportunity for public involvement and KDHE approval of the actions to be taken. The agreement is entitled: "Settlement Agreement for [RI/FS], and for Certain Remedial Actions to be Determined Following Public Involvement" ("City/KDHE Settlement Agreement").

The City/KDHE Settlement Agreement also provides a procedure by which any owner or business operator within the Site can obtain a "Certificate and Release" from the City if no hazardous substance or petroleum products were released or disposed of during the party's ownership of the property or operation of a business on the property. According to the agreement, such a release forecloses the City and KDHE from suit to recover costs re-

---

ion. (*See* docs. 539 & 562). The facts are taken from the parties' stipulations and the summary judgment record presented by the parties.

4. An RI/FS is undertaken to identify, evaluate and compare alternative approaches to remediation. *See United States v. Rohm and Haas Co.,* 2 F.3d 1265, 1271 (3d Cir.1993).

lated to the Site's cleanup from any party holding a release. The City and KDHE have also taken the position that the release provides contribution protection to the holder in suits by others who may ultimately be held liable for response costs at the Site.[5] The first certificate was issued under the clause no later than August 8, 1991. (Doc. 539 at ¶ 21). KDHE is a party to each Certificate and Release through operation of the City/KDHE Settlement Agreement. (Doc. 539 at ¶ 23).

At the time it was signed, the KDHE/City Settlement Agreement contemplated or required further negotiations and agreements involving KDHE, the City and Coleman. Specifically, it required the City to negotiate an agreement with Coleman to coordinate response actions within the Site, including contribution for costs incurred by the City. (Doc. 533, Ex. E at 38–40). KDHE, in turn, was required to enter into a consent order with Coleman requiring Coleman to coordinate its activities with those of the City and to contribute towards the City's response costs. (*Id.*)

In April 1991, Coleman entered into the required consent order with KDHE (entitled "Consent Order for Source Control with KDHE" (the "Consent Order")), which obligates Coleman to investigate, design and construct a "source control remedial action for the CDWF." (Doc. 539 at ¶ 30). It also sets forth various procedures aimed at accomplishing the end-goal of eliminating the CDWF as a source of groundwater contamination within the

site.[6] (*Id.*). The Consent Order requires Coleman to conduct an RI/FS aimed at identifying multiple remedial alternatives. Ultimately, KDHE must select and approve the preferred remedial alternative. (Doc. 539 at ¶ 41).

The City and Coleman also finalized a settlement agreement ("City/Coleman Agreement") in April 1991, in which both agreed to coordinate their efforts and that Coleman would contribute its "fair share of costs" towards the City's investigation and remediation. (Doc. 539 at ¶ 32). The City/Coleman Agreement specifies that the CDWF is a source of groundwater contamination within the Site, recognizes that other sources of contamination exist within the Site, and obligates the City to use its best efforts to recover its costs from other PRPs. (Doc. 539 at ¶¶ 33, 37).

Following negotiation of all the agreements and the City's completion of the initial investigation activities and public involvement, KDHE, in consultation with the EPA, issued a final Corrective Action Decision (CAD) on September 30, 1994, declaring the interim remedial response objectives and steps to be taken by the City at the Site. (Doc. 532, Ex. B, "Final [CAD]"). Since issuance of the CAD, the City has conducted additional monitoring, sampling and testing, as well as a remedial design, and in March 1999, submitted a draft RI/FS report to KDHE as required by the City/KDHE Settlement Agreement. (Doc. 539 at ¶ 62). According to the City's complaint, it has incurred $3.8 million in

---

**5.** *See* Joe Allen Lang, The City of Wichita's Environmental Projects: Creative Solutions to Difficult Enforcement Actions. (Doc. 536, Ex. 4 at 15–17 (explaining the intended effect of the release)). Mr. Lang is an assistant city attorney who prepared a paper on the City's steps to cleanup the Site. *See also* doc. 539, Ex. B, KDHE's final Corrective Action Decision, at 3 (explaining the effect of the releases); City of Wichita's Sur-reply in opposition

to Defendants' motion for Summary Judgment Regarding CERCLA Statute of Limitations, at 7 (same).

**6.** "Source control" is defined by the Consent Order as "identifying, eliminating and controlling all active contamination source areas, including but not limited to areas of soil contamination from past releases, at the [CDWF]." (Doc. 539 at ¶ 42).

conducting the RI/FS and other remedial activities and estimates that future remedial activities will cost approximately $20 to $24 million.

### C. THE CITY'S OWNERSHIP OF PROPERTY WITHIN THE SITE

The City owns property within the Site, commonly referred to as the former "Coleman B factory," which it purchased from Coleman in 1992 for $275,000. (Doc. 562 at ¶¶ 41, 42). The Coleman B property is encompassed within the CDWF, and, as discussed previously, was identified by KDHE as a source of groundwater contamination within the Site prior to the City's purchase. (Doc. 562 at ¶¶ 43, 46). The City was aware at the time of the purchase that the Coleman B property was a source of groundwater contamination and of Coleman's obligation pursuant to the Consent Order to remediate the property. (Doc. 562 at ¶¶ 44, 46 and 48). Coleman provided an environmental indemnity to the City as part of the sale. (Doc. 562 at ¶ 51).

The City has only used the Coleman B property as a parking lot and haunted house since the acquisition. (Doc. 562 at ¶ 54). In 1995, the City sold a portion of the Coleman B property for $276,962 and provided an environmental indemnity to the buyer. (Doc. 562 at ¶¶ 52 & 53). Testing performed in relation to this litigation confirmed the presence of TCE in soil at the Coleman B property. (Doc. 562 at ¶¶ 49 & 50).

The City purchased additional property within the Site from a private individual for $680,000 in July 1993 from which it operates a bus barn (the "Bus Barn" property).[7] The purchase agreement contains a paragraph expressing that the sale was "in lieu of condemnation." (Doc. 562 at ¶ 26).[8] A senior attorney for the City testified during his deposition that this language was intended to "memorialize the fact that the City [was] purchasing the property for public use, that the City has the power of [eminent] domain and that but for the negotiated purchase of the property, the City would have gone forward to acquire the property using its power . . . ." (Id.).

Glickman Inc., a defendant in this action from which the City seeks to recover response costs, leased a portion of the Bus Barn property prior to the City's purchase. Glickman operated a scrap metal business on the property. (Doc. 562 at ¶ 23; Doc. 1 at ¶ 68). The City seeks in this litigation to recover from Glickman for releases and threatened releases of hazardous substances which allegedly occurred during its operation of the scrap metal facility. (Doc. 562 at ¶ 23).

The City received notice from KDHE prior to its purchase that the Bus Barn property was a probable source of groundwater contamination and had specific notice the property was contaminated with chlorinated solvents, including TCE and BTEX (benzene, toluene, ethylbenzene and xylene). (Doc. 562 at ¶¶ 24, 25). Tests

---

7. The Bus Barn property encompasses approximately ten acres. (Doc. 532, Ex. B, "[CAD] for Bus Barn Facility Source Area Remediation," at 2).

8. The paragraph provides:

10. *Sale in Lieu of Condemnation.* As a municipal corporation organized under laws of the State of Kansas, Buyer has condemnation authority and can elect to pursue condemnation of the Real Estate.

Buyer has advised Seller that if Seller is unwilling to sell the Real Estate to Buyer, that Buyer intends to condemn the Real Estate. The parties acknowledge and agree that this sale is made as a result of Seller's desire to avoid the expense, delay, and uncertainty of a condemnation proceeding and this Agreement is entered into in lieu of such condemnation proceedings.
(Doc. 559, Ex. F at 4).

performed by the City after the purchase confirmed the property was contaminated with high levels of chlorinated solvents and other hazardous substances and had been a past source of groundwater contamination. (Doc. 562 at ¶¶ 27, 28). In response, the City conducted remedial action consisting of excavation and off-site disposal of contaminated soils. (Doc. 556, Ex. N at 1–1). Geoprobe soil testing conducted after this action was filed identified remaining hazardous substances on the Bus Barn property, including TCE. (Doc. 562 at ¶¶ 30–33).

### D. COLEMAN'S SOURCE CONTROL AT THE CDWF

The Consent Order requires Coleman to undertake its obligations at the CDWF based on a KDHE-approved work plan identifying the time-frame in which Coleman's work must be performed and the standards and specifications in accordance with which it must be performed. (Doc. 539 at ¶¶ 42 & 43). Groundwater Technology, Coleman's consultant, prepared the initial work plan, which was approved by KDHE shortly after the Consent Order was entered. (Doc. 539 at ¶ 43). It identifies a phased approach to implementing source control at the CDWF and provides that execution of the work plan will consist of performing a remedial investigation (RI) followed by a feasibility study (FS). The purpose of the RI/FS is to evaluate various remediation techniques and, ultimately, to recommend the most appropriate remedial measure. (Doc. 539 at ¶¶ 43, 44, 45). The work plan further specifies that a corrective action work plan will be prepared once KDHE approves the FS. (Doc. 539 at ¶ 46).

Coleman conducted the RI pursuant to the work plan from 1990 through at least July 31, 1996. The investigations involved monitoring, sampling, testing, and other data collection at the CDWF. (Doc. 539 at ¶ 48). The RI activities and findings were documented and submitted to KDHE in four RI reports (prepared around June 1991, August 1992, December 1992 and July 1996). (Doc. 539 at ¶ 49). As part of an initial step in the RI, Coleman installed three groundwater recovery wells, two soil vapor extraction systems (SVESs) and two air stripping towers. This equipment was installed during the period of July 1991 through March 1992. (Doc. 542 at 4, ¶¶ 12 & 13; Ex. 8 at ii). Remediated groundwater recovered at the CDWF is and has been discharged into the City's sanitary sewer system pursuant to a water discharge permit, initially issued in March 1992. (Doc. 531 at 6, ¶¶ 45, 48; Doc. 533, Ex. P). The groundwater recovery wells, SVESs, and air strippers, along with two aquifer sparaging systems, were adopted during the RI period as the interim remediation system at the CDWF. (Doc. 542, Ex. 8 at ii). The December 1992 and July 1996 RI reports, however, identified a need to expand the interim remedial system previously installed. (Doc. 539 at ¶¶ 54 & 55).

In June 1997, Coleman prepared and submitted its draft FS report to KDHE. (Doc. 539 at ¶ 57). The report identifies four possible remedial alternatives for final source control remedial action at the CDWF. (Doc. 539 at ¶ 56). Of the four identified, Coleman recommends adoption of the current interim remediation system, including the equipment installed from July 1991 through March 1992. (Doc. 542, Ex. 8 at ii). The report provides: "Due to the success of the interim measures, this FS is focused on remedial alternatives compatible with the interim system in operation at the site." (*Id.* at 1–1). According to the draft FS report, the interim system continues to provide hydraulic control of the CDWF source areas based on testing performed from April 1996 through

April 1997. (Doc. 542, Ex. 8 at ii).[9] Coleman proposes no modification to the current interim remedial system if adopted. (Doc. 542 at 5, ¶ 17). KDHE has not provided final approval nor has it determined whether any part of the current interim remedial system is consistent with a permanent remedy at the CDWF. (Doc. 546 at 13–14, ¶ 20; Doc. 539 at ¶ 57).

### III. THE CITY'S STATUS AS A POTENTIALLY RESPONSIBLE PARTY

 CERCLA, as a amended by SARA, authorizes two types of actions through which a party may recoup costs incurred in hazardous waste cleanup: a § 107(a) cost recovery action and a § 113(f) contribution action. *See* 42 U.S.C. §§ 9607(a), 9613(f); *United States v. Colorado & Eastern R.R. Co.,* 50 F.3d 1530, 1535 (10th Cir.1995). Section 107 identifies "covered persons" subject to CERCLA liability (enumerated in § 107(a)(1)-(4)) and outlines the cleanup costs which may be recovered from a covered person under CERCLA. "Covered persons" are commonly referred to as "potentially responsible parties" or "PRPs." *See, e.g., In re Hemingway Transport, Inc.,* 993 F.2d 915, 931 (1st Cir.1993). As the section relates to this case, it provides that "covered persons" (PRPs) shall be liable for "any other necessary costs of response incurred by *any other person* consistent with the national contingency plan." 42 U.S.C.

§ 9607(a)(4)(B) (emphasis added).[10] Liability imposed in a § 107(a) action is strict, joint and several for all response costs associated with hazardous waste cleanup at a site. *See Colorado & Eastern,* 50 F.3d at 1535; *Sun Co., Inc. v. Browning–Ferris, Inc.,* 124 F.3d 1187, 1190 (10th Cir. 1997). Fault or culpability is irrelevant under CERCLA's statutory scheme. *See United States v. Township of Brighton,* 153 F.3d 307, 330 (6th Cir.1998). A defendant who is shown to be a PRP in a § 107(a) action can escape joint and several liability (and have costs apportioned amongst PRPs) only if the harm is divisible, which is rarely the case and which is not claimed to be the case here. *See Sun,* 124 F.3d at 1190.

As originally enacted, CERCLA included only § 107's joint and several recovery scheme and left a PRP singled out in a cost recovery action without a statutory means to apportion response costs among other covered persons. *See Sun,* 124 F.3d at 1190. Courts responded by recognizing an implicit right to contribution between PRPs. *See id.* The statutory right to contribution currently provided for by CERCLA was embraced by Congress with SARA's enactment of § 113(f), whose objective was to "clarif[y]" and "confirm[ ]" the previously, judicially-recognized right of a PRP to contribution for CERCLA costs. *See Colorado & Eastern,* 50 F.3d at 1535. Section 113(f) provides that "the

---

9. The APCO defendants present facts that the groundwater recovery wells achieved hydraulic control of CDWF source areas on or before May 14, 1992. (Doc. 542 at 4, ¶ 14). Further testing, however, was required by KDHE to verify conclusions regarding hydraulic control, doc. 546 at 8, ¶ 14, which was apparently ongoing through at least April of 1997.

10. Section 107(a) provides, in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section-

(1) the owner and operator of a vessel or a facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

\* \* \* \* \* \*

shall be liable for—

\* \* \* \* \* \*

(B) Any other necessary costs of response incurred by any other person consistent with the national contingency plan;

court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

Since SARA's enactment, the Tenth Circuit has sought to clarify the interaction between § 107 and § 113. *See Sun Company*, 124 F.3d at 1188; *Bancamerica Commercial Corp. v. Mosher Steel of Kansas, Inc.*, 100 F.3d 792, 799 (10th Cir.1996); *Colorado & Eastern*, 50 F.3d at 1535. In *Colorado & Eastern*, in particular, the Tenth Circuit held that a claim by a PRP against other PRPs to recover response costs incurred in cleanup efforts is one for contribution and must proceed under the rubric of § 113(f), rather than § 107(a), regardless of how the claim is plead. *See id.* at 50 F.3d at 1536 ("[A]ny claim that would reapportion costs between [PRPs] is the quintessential claim for contribution."). As defendants correctly note, every circuit to address the issue has followed the same course and similarly concludes that a PRP may not maintain an action under § 107.[11] "The rule that potentially responsible persons cannot sue under § 107 protects the strict liability scheme created by the statute, and thus any exceptions to that rule should be narrow ones." *Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 191 F.3d 409, 416 (4th Cir.1999).

## A. THE PARTIES' POSITIONS

Defendants contend they are entitled to summary judgment that the City is a PRP and, based on *Colorado & Eastern*, is limited to seeking contribution pursuant to § 113(f). If defendants are correct, the City may not look to each and every defendant to recover the total costs incurred, or which will be incurred, in the cleanup of the Site. Defendants attempt to establish the City's PRP status pursuant to § 107(a)(1) and (2) on essentially three grounds: 1) the City owned property within the Site when the release of a hazardous substance occurred; 2) the City presently owns contaminated property within the Site; and 3) the City owns and operates sewer lines within the Site from which releases of hazardous substances occurred.

The City asserts that there are disputed issues of material fact which preclude summary judgment that it is a PRP. Alternatively, the City claims that even if it is found to be a PRP, it should be permitted to proceed with its § 107(a) claims because of the unique facts of this case.

The court concludes the City is a PRP pursuant to § 107(a)(1) based on its present ownership of a portion of the Coleman B property and the Bus Barn property and that the City is not entitled to maintain its § 107(a) action despite the "unique" nature of this case.

## B. COLEMAN B PROPERTY

■ A current "owner" or "operator" of a facility where there is a release or threat of release is subject to CERCLA liability under § 107(a)(1) regardless of whether the hazardous substances were deposited or disposed of by someone else. *See FMC Corp. v. United States Dep't of*

---

11. *See, e.g., United Tech. Corp. v. Browning-Ferris Indus. Inc.*, 33 F.3d 96, 103 (1st Cir. 1994), *cert. denied*, 513 U.S. 1183, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995); *Bedford Affiliates v. Sills*, 156 F.3d 416, 425 (2d Cir.1998); *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1121 (3d Cir.1997); *Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R. Co.*, 142 F.3d 769, 776 (4th Cir. 1998); *Amoco Oil Co. v. Borden, Inc.*, 889

F.2d 664, 672 (5th Cir.1989); *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir.1994); *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 936 (8th Cir.1995); *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1301 (9th Cir.1997); *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489 (11th Cir.1996). Certain exceptions exist which are discussed *infra*.

*Commerce*, 29 F.3d 833, 834–35 (3d Cir. 1994); *see also California v. Blech*, 976 F.2d 525, 526–27 (9th Cir.1992) ("Section 107(a)(1) simply provides for recovery of removal costs from 'the owner or operator of ... a facility ... from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance ....' "). The facts establish that the City purchased the TCE-laden Coleman B property in 1992 even though it was identified as a source location for groundwater contamination within the Site. The City is thus an owner of a facility under CERCLA § 107(a)(1).[12]

■ The City argues that the Coleman Consent Order (Doc. 559, Tab G) entered prior to its acquisition of the property absolves it of response-cost liability and does not preclude its maintenance of its § 107 claim. The Consent Order obligates Coleman to identify, eliminate and control all active groundwater contamination source areas at the CDWF, including the former Coleman B factory owned by the City. The essence of the City's argument is that it is unfair to subject it to potential liability for property owned within the Site when Coleman has already agreed to and is remediating the contaminated property.

The City's argument is unsupported by legal authority and invalid for that reason alone. Furthermore, the City makes absolutely no attempt to frame its argument within CERCLA's statutory structure, thereby explaining how a previous owner's agreement to perform some remediation places a present owner beyond § 107(a)(1)'s reach. The City's contention flies in the face of CERCLA's strict liability scheme, which is that if a party purchases property known to be contaminated, that party is subject to strict liability merely because of its status as the current owner. Congress mitigated this harsh effect by setting forth limited defenses in § 107(b). The City makes no attempt to establish that any of the § 107(b) defenses cover its ownership of the portion of the Coleman B property.

Even assuming a consent order obligating a previous owner to clean up property could absolve the current owner from CERCLA liability, Coleman is not required to perform all measures necessary to remedy the groundwater contamination caused by the Coleman B property. The Consent Order merely obligates Coleman to eliminate its former property as a "source" of groundwater contamination, and nothing from the record suggests Coleman must remediate downgradient groundwater contamination that may have already migrated beyond the CDWF boundaries. The City itself alleges the harm caused within the Site is indivisible, and thus, its attempt to divide out liability based on the Consent Order is inconsequential.

## C. *BUS BARN PROPERTY*

Undisputed facts further establish that the City owns the Bus Barn property and that the property is a facility, as defined by CERCLA. The City argues, however, that it is not a PRP under § 107(a)(1) based on its ownership of the Bus Barn property because CERCLA § 101(20)(D), 42 U.S.C. § 9601(20)(D), excludes from the definition of "owner or operator" any "unit of ... local government which acquired ownership or control *involuntarily* through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government *involuntarily* acquires title by virtue of its function as sovereign." (emphasis added). The City

---

**12.** A "facility" is defined as, among other things, "any site or area where a hazardous substance has been deposited, stored, dis-

posed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9).

also argues its § 107(a) status should not be forfeited because CERCLA § 104(j)(3), 42 U.S.C. § 9601(j)(3), shelters a local government from liability for property purchased with the intention of performing remedial action.

### 1. Involuntary Acquisition by Local Government

■ The City argues § 101(20)(D) is applicable in this suit because the Bus Barn property was purchased "in lieu of condemnation," according to the purchase agreement. The City suggests that these words somehow demonstrate that it "involuntarily [acquired] title [to the Bus Barn property] by virtue of its function as sovereign."

The City offers virtually no explanation of how the language in a purchase agreement could trigger the statute's exception. Based on the City's reliance on the senior city attorney's deposition testimony, however, the court infers the City's position to be that had the sale not occurred, the City would have condemned the property pursuant to its eminent domain power, and, for this reason, the City acquired the property "by virtue of its function as sovereign." The City fails to offer any evidence that its purchase of the property was "involuntary."

After an exhaustive search, the court located only one decision in which a federal district court addressed a similar situation. See United States v. Occidental Chem. Corp. (OCC), 965 F.Supp. 408 (W.D.N.Y. 1997). OCC involves the infamous lawsuit initiated by the State of New York and the United States government to recoup the cost of cleaning up the Love Canal area.[13] Among the defendants to the suit were OCC, the original polluter, and the City of Niagra Falls, which acquired a portion of the Love Canal property subsequent to OCC's ownership of the property. The decision relates only to OCC's cross-claim against the City of Niagra Falls for contribution. All other claims were resolved by the court in prior orders.

The City of Niagra Falls argued, among other things, that in purchasing the property to build roads and a park it acquired the property "involuntarily" because such activities are functions a sovereign must perform. See id. at 413. The court rejected the argument concluding:

> The City's definition of involuntary is inconsistent with Congressional intent in enacting CERCLA. First, the statute clearly states that as a general matter State and local governments are not to be distinguished from private entities. Since all municipal purchases are made for the benefit of citizens, the City's construction of the word involuntary would cause the exception to swallow the rule. Second, the statute sets out the types of involuntary acquisitions contemplated by Congress; bankruptcy, tax delinquency, and abandonment. A purchase to build a park simply does not follow as an analogous circumstance "in which the government involuntarily acquires title by virtue of its function as a sovereign." Finally, the circumstances of the acquisition do not satisfy the plain meaning of the word involuntary. The City evaluated the land carefully and considered the problems of the buried waste before taking title from the Board. This is clear evidence that the City purchased the land voluntarily.

*Id.* at 413–14.

The nature of the City's acquisition of the Bus Barn property is analogous to the City of Niagra Falls' purchase in *OCC*, and the City's argument that § 101(20)(D) ap-

---

**13.** *See* 4 William H. Rodgers, Jr., Environmental Law, Hazardous Wastes & Substances § 8.1, at 471–72 (1992), for a discussion of the Love Canal's contribution to CERCLA's enactment.

plies is rejected by this court as well. Here, the City *voluntarily purchased* the property for use as a bus barn. As in *OCC*, such an acquisition is not analogous to the transactions set forth by Congress in § 101(20)(D). The City evaluated the Bus Barn property and was well aware that it was contaminated with hazardous substances and was a potential source of groundwater contamination. However, it purchased the property nevertheless.

Even if the court accords the City a reasonable inference that the possibility of eminent domain was a factor in acquiring the property from the individual seller based on the clause in the purchase agreement, such an inference does not change the conclusion. The City provides no authority, nor has the court found any, suggesting that a municipality's acquisition of property through the *actual* exercise of its eminent domain power is an *involuntary* acquisition "by virtue of its function as sovereign." [14] While only a sovereign can

acquire property through exercise of eminent domain, such an acquisition is not involuntary, at least as far as the sovereign is concerned. The other manners of involuntary acquisition expressly mentioned in § 101(20)(D) are distinguishable from eminent domain. In the case of bankruptcy, tax delinquency and abandonment, a state or local government acquires rights to the property through some type of inaction on the part of a landowner. In an acquisition through eminent domain, the property is acquired because of some characteristic desirable to the governmental entity and affirmative steps are taken to acquire the property for some specific use.

 Even assuming acquisition by eminent domain is implicitly covered by § 101(20)(D), the City's argument is unpersuasive because it did not acquire the property through eminent domain. *See City of Toledo v. Beazer Materials and Servs., Inc.*, 923 F.Supp. 1013, 1020 (N.D.Ohio 1996).[15] Additionally, under the

---

**14.** In *Transportation Leasing Co. v. California*, 861 F.Supp. 931, 960–61 (E.D.Cal.1993), a decision discussed in *OCC*, the court found § 107(20)(D) inapplicable where the California Department of Transportation acquired a portion of a landfill site through eminent domain for purposes of constructing a freeway. The conclusion, however, does not appear to be premised on the ground that subsection (D) is inapplicable to acquisitions through the exercise of eminent domain, but rather, it was inapplicable because the department was liable for arranging for disposal of hazardous substances, not as an owner or operator.

**15.** *Beazer* involved the City of Toledo's attempt to avoid liability for its ownership of contaminated property based on CERCLA § 101(35)(A)(ii), 42 U.S.C. § 9601(35)(A)(ii). Section 101(35)(A)(ii), in conjunction with § 107(b)(3), provides an "innocent landowner" defense to a governmental entity which acquires a facility "by escheat, or through any other involuntary transfer or acquisition, or *through the exercise of eminent domain authority by purchase or condemnation*." (Emphasis added). To be entitled to the defense, the governmental entity must show that it

exercised due care and took reasonable precautions before it acquired the property. 42 U.S.C. §§ 9601(35)(A), 9607(b)(3)(a) & (b).

The City of Toledo argued, based on the court's previous ruling that the property in question was purchased pursuant to the City of Toledo's eminent domain power, that it was entitled to the defense. The *Beazer* court, however, found § 101(35)(A) inapplicable because the City of Toledo agreed on a purchase price with the seller and did not actually resort to its power pursuant to statutory procedures to acquire the property by eminent domain. *See id.* at 1020–21.

Thus, even if § 101(20)(D) did cover acquisition by eminent domain, the City is not entitled to protection because it did not actually resort to its power pursuant to state law to acquire property by exercise of eminent domain. *See* K.S.A. §§ 26–201, and 26–501 through 26–517 (setting forth a city's authority and procedure for expropriating property under Kansas law).

In its sur-reply, the City attempts to invoke the governmental innocent landowner defense pursuant to §§ 101(35)(A)(ii) and 107(b)(3) under the guise that it mistakenly failed to

City's proffered reading of § 101(20)(D), a municipality could place itself beyond CERCLA's reach by merely threatening the exercise of eminent domain. Such a reading would thwart Congress's intent to treat state and local governments in the same manner as private entities because a governmental entity can almost always acquire property through the exercise of eminent domain and could always make the threat. Here, the City's acquisition occurred through a typical contract to purchase real estate which any legal entity could have undertaken. Thus, the court concludes that the City's purchase of property does not fall within the protections of § 101(20)(D).

### 2. *Purchase for Remedial Purposes*

■ The court also finds no merit *whatsoever* to the City's argument based on § 104(j)(3). Section 104(a) of CERCLA authorizes the federal government (or a state if delegated) to take response action to a release or threatened release that is consistent with the National Contingency Plan, subject to a number of limitations. Subsection (j) further authorizes the federal government to acquire property through a number of means if such an acquisition is necessary for remedial action authorized by CERCLA, provided a state agrees to accept transfer of the federal government's interest in the property when the remedial action is complete. *See* 42 U.S.C. 9604(j)(1). A state or local government which later acquires the property is exempt from CERCLA liability. *See id.* at

(j)(3). In this case, there was no government-lead action pursuant to § 104 to trigger subsection (j)(3), the City purchased the property from a private individual, and the City offers no evidence the property was purchased for remediation purposes. The City is therefore afforded no protection by the provision.

■ Based on the portion of the Coleman B property and the Bus Barn property, it is evident that there are no factual disputes about whether the City falls within the definition of a PRP pursuant to § 107(a)(1). It does. The court need not expend further effort discussing the City's arguments about the other properties it owns or defendants' remaining arguments supporting their contention that the City is a PRP. If a party is a PRP by virtue of § 107(a)(1), the fact that the party owns only a portion of a site, or how much of the site it owns, is irrelevant and provides no defense to liability. *See United States v. Rohm and Haas Co.,* 2 F.3d 1265, 1279 (3d Cir.1993) ("A current owner of a facility may be liable under § 107 without regard to whether it is the sole owner or one of several owners.").[16]

### D. *THE CITY'S FALL–BACK ARGUMENT*

■ In the event it is found to be a PRP, the City urges this court to hold that a public entity, which voluntarily agrees to clean up a facility with a reasonable belief that it is not a PRP, still is entitled to

---

cite these CERCLA provisions in its response brief. The innocent landowner defense is separate from the defense in § 101(20)(D) and should have been raised in the original response brief. Because it was not, the court rejects the argument. Assuming it had been properly raised, however, the City's argument fails because, 1) as in *Beazer,* the City did not actually exercise eminent domain and 2) the City has not met its burden to show that due care was exercised and reasonable precau-

tions were taken before the Bus Barn property was acquired.

**16.** In *Rohm and Haas,* a PRP subject to status liability argued it should not be subjected to joint and several liability because it owned a small portion of the site (10% of the contaminated area). *See* 2 F.3d at 1279. The court rejected the argument, concluding that the definition of "facility" transcends property boundaries. *See id.*

maintain a cost recovery action. The City makes essentially three arguments in support of its request: 1) neither § 107 nor § 113 expressly proscribe a PRP's ability to maintain a cost recovery action; 2) Tenth Circuit precedent does not foreclose the possibility of exceptions to *Colorado & Eastern*'s holding that a PRP cannot maintain a cost recovery action; and 3) prohibiting the City's cost recovery claims frustrates CERCLA's policy of encouraging quick and efficient cleanups.

The City's first argument is a futile attack on *Colorado & Eastern*'s holding. The City argues § 107(a)(4)(B) authorizes a private party response action for "costs of response incurred by *any other person* consistent with the national contingency plan" and does not expressly proscribe a PRP's right to maintain a private party response action, rather than one for contribution. The City suggests there is no apparent reason, given CERCLA's broad remedial purpose, why § 107(a)'s joint and several remedy should be limited to non-PRPs. This court, however, has no discretion to deviate from *Colorado & Eastern*. The decision remains controlling precedent and has been followed in subsequent Tenth Circuit decisions. *See Sun Company*, 124 F.3d at 1190; *Bancamerica Commercial*, 100 F.3d at 800. In addition, contrary to the City's assertion, the *Colorado & East-*

*ern* court explained the rationale behind its holding: If PRPs were permitted to bring a § 107(a) action, " § 113(f) would be rendered meaningless." 50 F.3d at 1536; *see also New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1122–23 (3d Cir.1997) (discussing the same rationale in greater detail).[17]

The City next argues a PRP may in certain circumstances maintain a § 107(a) action in the Tenth Circuit based on a footnote in *Sun v. Browning–Ferris, Inc.* In *Sun*, the court rejected a PRP-plaintiff's attempt to distinguish *Colorado & Eastern* on the ground that it voluntarily undertook cleanup of contaminated property and was therefore permitted to maintain a § 107(a) action. In the footnote relied upon by the City, however, the *Sun* court expressly declined to opine whether an innocent PRP [18] could maintain a private party cost recovery action. *See Sun Company*, 124 F.3d at 1191 n. 1 ("We express no opinion on whether PRPs who assert their *innocence* with regard to any waste at a site may be able to recover all of their costs from other PRPs in an action under § 107."). The City latches on to this footnote and argues that the issue of exceptions to a PRP's inability to bring a cost recovery action is an open question in the Circuit despite *Colorado & Eastern*'s

---

17. The City argues the Supreme Court rejected the notion that § 107 and § 113 provide mutually exclusive remedies in *Key Tronic Corp. v. United States*, 511 U.S. 809, 816, 114 S.Ct. 1960, 1966, 128 L.Ed.2d 797 (1994) (CERCLA "authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107."). The Court further referred to § 107 as "impliedly authoriz[ing] private parties to recover cleanup costs from *other* PRPs." *Id.* at 818, 114 S.Ct. at 1967 (emphasis added). *Key Tronic*, however, provides no basis to depart from *Colorado & Eastern*'s holding because it was decided prior to *Colorado & Eastern,* yet the Circuit did not rely on nor mention the case, presumably

on the basis that it does not control the issue. *See Johnson County Airport Comm'n v. Parsonitt Co.*, 916 F.Supp. 1090, 1093 n. 4 (D.Kan.1996) ("We must assume that the circuit did not consider *Key Tronic* controlling on the question."). Moreover, *Colorado & Eastern* was relied upon by the Circuit in *Bancamerica* and *Sun.*

18. This court uses the term "innocent PRP" to delineate a party liable solely because of its status as the owner of a facility under § 107(a)(1) but which has not itself contributed to the contamination. In other words, a party which falls within the definition of a PRP *solely* by virtue of its status as a landowner.

holding. The City also identifies numerous decisions from other jurisdictions recognizing exceptions to the rule. Relying on these decisions, the City further argues the Tenth Circuit, if faced with the issue, would recognize an exception to *Colorado & Eastern* in this case. None of the cases relied upon, however, involved a cost recovery claim by a municipality which voluntarily undertook cleanup of a massive, multi-property site.

As a practical matter, the decisions which recognize that a PRP generally cannot bring a cost recovery action, yet permit exceptions in certain instances, fall into two categories. A minority of courts follow the Seventh Circuit's position taken in *Rumpke of Ind., Inc. v. Cummins Engine Co., Inc.*, 107 F.3d 1235, 1241 (1997). *Rumpke* holds that an innocent PRP may maintain a § 107(a) claim when factual uncertainty exists as to whether it contributed to the presence of hazardous substances on its property. *See Rumpke*, 107 F.3d at 1240; *see also Estes v. Scotsman Group, Inc.*, 16 F.Supp.2d 983, 988 (C.D.Ill.1998) (discussing the *Rumpke* exception).[19] Other courts, along with many commentators, reject *Rumpke* as inconsistent with CERCLA's strict liability scheme and instead require a PRP-plaintiff to establish one of the more restrictive defenses enumerated in CERCLA § 107(b) to maintain suit. *See, e.g., Bedford Affiliates v. Sills*, 156 F.3d 416, 425 (2d Cir.1998) (declining to adopt the *Rumpke* approach because it "would carve out judicially an additional defense that Congress itself chose not to create"); *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 191 F.3d 409, 416 (4th Cir.1999) ("If an 'innocent party' exception is even possible, a question we

need not decide here, it would therefore seem prudent to limit its applicability to those who can make out one of the defenses to liability that § 107 itself provides. *See* 42 U.S.C.A. § 9607(b)(3)." (in dicta)); *Burlington Northern*, 76 F.Supp.2d at 1157–58 (rejecting *Rumpke* ); Craig N. Johnston, *Current Landowner Liability Under CERCLA: Restoring the Need for Due Diligence*, 9 Fordham Envtl. L.J. 401, 465–467 (1998) (criticizing the *Rumpke* approach as contrary to CERCLA's joint and several liability scheme). Many other courts have required a PRP-plaintiff to show a § 107(b) defense in order to maintain a cost recovery action but have done so without specifically rejecting *Rumpke. See, e.g., New Castle*, 111 F.3d at 1124 (acknowledging, without adopting, that a party entitled to a defense under § 107(b) may bring a § 107(a) action against other PRPs); *Advanced Technology Corp. v. Eliskim, Inc.*, 87 F.Supp.2d 780, 784 (N.D.Ohio 2000); *M & M Realty Co. v. Eberton Terminal Corp.*, 977 F.Supp. 683, 686 (M.D.Pa.1997) ("We conclude that, under the circumstances alleged in this case, if M & M can establish that it is an innocent landowner under Section 107(b)(3), it will be entitled to bring a cost recovery action."); *Sinclair Oil Corp. v. Dymon, Inc.*, 988 F.Supp. 1394, 1396 n. 1 (D.Kan.1997) (recognizing a PRP-plaintiff's right to cost recovery if a § 107(b)(3) defense is available).

In urging the court to recognize an exception to *Colorado & Eastern*, the City does not specifically ask the court to adopt *Rumpke* 's standard; however, that would be the implicit result were the court to hold as the City requests. The nucleus of the City's argument is that it did not con-

---

**19.** The *Rumpke* court clarified that if facts later established the innocent PRP's contribution to the contamination, dismissal of its § 107 claim was appropriate. 107 F.3d at 1241. Further, according to the *Rumpke* court, an innocent PRP must plead its own innocence to maintain a 107 claim. *See Burlington Northern & Santa Fe Railway Co. v. Cargill, Inc.*, 76 F.Supp.2d 1155, 1157–58 (D.Kan.1999) (citing *Rumpke* ).

tribute to contamination of the Site, regardless of the manner in which the requested holding is framed.[20] Assuming an innocent-PRP exception is permitted in the Tenth Circuit, this court is in agreement with courts in and out of this district holding that a defense under § 107(b) must first be established before a PRP may maintain a cost recovery action. The City has not shown any defense under § 107(b) in relation to the Coleman B and Bus Barn properties. To hold that the City can proceed in spite of these failures would render meaningless CERCLA's statutory imposition of liability resulting solely from ownership of contaminated property under § 107(a)(1) and the statutory right of such parties to contribution under § 113(f).

■ Lastly, the City argues policy considerations provide an impetus for recognizing an exception in this case. The City contends eliminating its § 107(a) remedy thwarts CERCLA's policy of encouraging fast and efficient cleanups, and that the policy reasons enunciated by courts for prohibiting cost recovery actions by PRPs are absent in this case. The court finds no merit to the City's contention: Section 107 suits by PRPs is forbidden by CERCLA's statutory scheme, not public policy. The City's contention, that voluntary cleanups will be hindered, is twofold: 1) a PRP's ability to bring suit pursuant to § 107(a) provides incentive to undertake a voluntary cleanup, and 2) private parties will be unwilling to undertake voluntary cleanup for fear that defendant-PRPs will find

some basis, through discovery, to establish the private party's PRP status thereby eliminating its ability to recover all of its costs. The City also identifies four factors in favor of permitting it to maintain its cost recovery action: 1) it had no reason to believe it was a PRP *when it agreed to assume* responsibility for the cleanup; 2) it is a public entity acting to protect the health and welfare of its citizens; 3) it did not dispose of hazardous substances within the Site; and 4) it voluntarily agreed to remediate the Site.[21]

■ The court rejects, as an initial matter, the notion that policy considerations can form the basis for an exception in this case. *See Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d at 1298, 1304 (rejecting an argument, "in light of the controlling text, structure, and logic of CERCLA" and circuit precedent, that prohibiting a cost recovery suit by a PRP would hamper the policy of promoting rapid and voluntary cleanups). As previously stated, this court finds that any exception permitting suit by a PRP must be rooted in the text § 107(b), not judicially legislated based on policy considerations. Moreover, the foundational premise behind the City's argument that the court's holding will hinder voluntary cleanups is flawed. It will undoubtedly be the extremely rare situation, if ever, in which a party voluntarily agrees to remediate a CERCLA-defined facility without knowledge of its status as a PRP. Even assuming such a party exists, however, this court doubts

20. The City on multiple occasions focuses on the fact that it did not contribute to the contamination or that an exception is necessary to prevent injustice to PRPs seeking to recover response costs associated with contamination to which they did not contribute.

21. The City also argues sustaining defendants' 107/113 motion will undermine the Kansas Voluntary Cleanup and Property Redevelopment Act, K.S.A. § 65–34,161 *et seq.* The Act,

however, does not apply to property listed or proposed for listing on the NPL or property which is the subject of an agreement with a city, state or federal agency. *See id.* at § 65–34,164(c)(1) & (2)(B). The Act also provides: "Nothing in this act shall absolve any person from obligations under any other law or rule and regulation." *See id.* at § 65–34,171(a). Because the Site is not covered by the Act, there is no interference to complain about.

that Congress ever intended ignorance to form the basis for a defense to CERCLA's strict liability scheme.

A second flaw in the City's position is that it falls outside the category of PRPs it argues should be permitted to bring a cost recovery action. The City's PRP status arises by virtue of its ownership of contaminated properties purchased with knowledge that both were likely sources of groundwater contamination. The City nevertheless purchased the properties after agreeing to spearhead remediation of the Site. Thus, the City's inability to maintain a § 107(a) action has nothing to do with whether it did or did not reasonably believe it was a PRP when it agreed to remediate the Site. In essence, for reasons to which this court is not privy, the City placed itself in the category of a PRP pursuant to § 107(a)(1) upon its own volition and eliminated any right to impose joint and several liability on the defendants.

As for incentives, while the City's argument that recognizing an exception in this case would further the goal of voluntary cleanups appears logical at first blush, the argument has been rejected because it unfairly benefits a PRP with access to financial resources (such as tax revenues in this case). *See Borough of Sayreville v. Union Carbide Corp.*, 923 F.Supp. 671, 679 n. 12 (D.N.J.1996); *Kaufman & Broad–South Bay v. Unisys Corp.*, 868 F.Supp. 1212,

1215 n. 2 (N.D.Cal.1994). It has also been rejected as illusory because the defendant-PRPs could later compel the plaintiff-PRP to pay its pro rata share under § 113(f). *See id.; Kaufman*, 868 F.Supp. at 1215 n. 2. Although it may seem unfair to eliminate the City's joint and several liability remedy given its laudable and public-spirited actions in undertaking the cleanup, the perceived unfairness may be remedied in the apportionment and contribution phase of this lawsuit. *See Rohm and Haas*, 2 F.3d at 1279–80 (recognizing that joint and several liability of § 107 seems unfair but the solution is found in apportionment and contribution). It is then that the City may point to the factors upon which it currently relies and its motivations for undertaking the cleanup.[22] For these reasons, the Court concludes the City is not entitled to maintain its § 107(a) cost recovery claims.

## IV. STATUTE OF LIMITATIONS

Defendants seek summary judgment that the City's contribution claims, filed in October 1998, are barred by CERCLA § 113(g)'s limitations periods.

CERCLA specifies two limitations periods governing the time in which a contribution claim must be brought. *See* 42 U.S.C. § 9613(g)(2), (3). As relevant to this case, § 113(g) provides:

(2) Actions for recovery of costs

---

**22.** As one commentator explains, landowners subject to status liability have done well in the allocation stages of a § 113 action. *See,* Johnston, *supra,* at 467. One interesting aspect to this litigation, however, is that the City only seeks to recover from twenty-seven of the 500 PRPs identified initially in the LSI. The City's recovery from many of the others has been foreclosed through the Certificates and Releases issued pursuant to the City/KDHE Settlement. As the court understands the release program, many of those receiving releases were potentially liable based on their status as landowners within the Site. While a court is often faced with the issue of allocating "orphan shares" in a CERCLA contribution action, the share of liability associated with contaminated property owned by persons with a Certificate and Release (assuming response costs were incurred by the City in relation to those properties) is not the typical "orphan share." *See, e.g., Sun Co.*, 124 F.3d at 1193 n. 4 (" 'Orphan shares' are those shares of the waste responsibility which are attributable to PRPs who either are insolvent or cannot be located or identified.").

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced—

\* \* \* \* \* \*

(B) for a remedial action, within **6 years** after initiation of physical on-site construction of the remedial action . . . .

\* \* \* \* \* \*

(3) Contribution

No action for contribution for any response costs or damages [23] may be commenced more than **3 years** after—

\* \* \* \* \* \*

(B) the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

(emphasis added). Courts refer to these statutory provisions as "triggering events."

All parties discuss the Tenth Circuit's decision in *Sun Co. v. Browning–Ferris, Inc,* but, of course, their respective interpretations of the case differ. In *Sun,* the plaintiffs incurred cleanup costs in response to an EPA unilateral administrative order under § 106 and sought contribution from other PRPs. An administrative order pursuant to § 106 is not one of the triggering events enumerated in § 113(g)(3). The district court therefore concluded a gap in § 113(g)(3) existed, requiring a judi-

cially-supplied triggering event for purposes of determining when the three-year limitations period accrued. *See Sun Co. v. Browning–Ferris, Inc.,* 919 F.Supp. 1523, 1531 (N.D.Okla.1996). The district court resorted to federal common law to fill the gap. *See id.*

The Tenth Circuit disagreed, reasoning that a § 113(f) contribution claim is by definition "an action for the recovery of costs referred to in § 107" and that, because no previous § 106 or § 107 action had been commenced, the *Sun* plaintiffs' contribution claim was the "initial action for recovery of costs referred to in section 9607" to which § 113(g)(2)'s six-year limitation period expressly applied. 124 F.3d at 1192–93. On the other hand, the court recognized that if one of the four "triggering events" under § 113(g)(3) occurred, the three-year limitation period would apply. *Id.* at 1193.

## A. *THE PARTIES' POSITIONS*

Joint defendants [24] initially argue that the City's contribution claims are barred by the three-year limitation period of § 113(g)(3)(B). They contend that the City/KDHE Settlement Agreement the Coleman Consent Order, the City/Coleman Settlement Agreement, and the issuance of the first Certificate and Release, all which occurred in 1991, are "triggering events" which activated subsection (g)(3)(B) because those events constitute "administrative orders" relating to de minimis or cost recovery settlements under § 122(g) or § 122(h).[25] Thus, joint defendants assert

---

**23.** "Damages" is defined as damages "for injury or loss of natural resources as set forth in section 9607(a) or 9611(b) of [Title 42]." 42 U.S.C. 9601(6).

**24.** The court refers to defendants as "joint defendants" and "APCO defendants" in differentiating between the arguments in support of the two statute of limitations summary judgment motions.

**25.** The City claims that joint defendants have argued that three "triggering events" oc-

curred: (1) de minimis settlements approved by KDHE; (2) cost recovery settlements approved by KDHE and (3) a judicially approved settlement. (Doc. 550). Although joint defendants' positions are sometimes difficult to analyze, the court discerns no specific claim that a judicially approved settlement has occurred. Certainly there is no evidence of such a settlement. After reading their submissions (Docs. 531 and 534) many times, the court believes that joint defendants are rely-

that the three-year limitations period ran on the City's contribution claims sometime in 1994. (Doc. 534 at 6–9). Alternatively, joint defendants argue the City's contribution claims are barred under the six-year limitation period of § 113(g)(2)(B) because initiation of physical on-site construction of remedial action occurred at the Site more than six years prior to the commencement of this action. (Doc. 534 at 11–14). APCO defendants' arguments in support of their motion are fundamentally the same as those presented in joint defendants' alternative position.

The City responds that § 113(g)(3)'s three-year limitations period is inapplicable because no "triggering event" has occurred. The City asserts that KDHE has no authority under the Cooperative Agreement to enter into, or authorize any other party to enter into, cost recovery or de minimis settlements pursuant to § 122(g) or (h).[26] The City further asserts that § 113(g)(2)'s six-year limitations period would control but that the City has initiated no remedial action at the Site that would start § 113(g)(2)'s six-year limitation period. The court agrees with the City.

### B. SECTION 122—ADMINISTRATIVE ORDERS RELATING TO DE MINIMIS AND COST RECOVERY SETTLEMENTS

█ Section 122 was enacted as part of SARA in 1986. It represents Congress's recognition of the importance of settlement agreements in cleaning up hazardous wastes and attempts to encourage the settlement process. *See* Lynnette Boomgaarden & Charles Breer, *Surveying the Superfund Settlement Dilemma*, 27 Land & Water L.Rev. 83, 87–88 (1992). Three types of settlements are addressed in § 122:(1) clean-up agreements under subsection (d); (2) de minimis settlements involving only a minor portion of the subject response costs under subsection (g),[27] and (3) cost recovery settlements under subsection (h).[28] *See City of New York v. Exxon Corp.*, 697 F.Supp. 677, 691 (S.D.N.Y.1988). By its express terms, only the federal government has authority to enter into settlements under § 122. *See Kelley v. Wagner*, 930 F.Supp. 293, 298 (E.D.Mich.1996); *see also* 42 U.S.C. § 9622(a) (providing that the President is authorized to enter into agreements under § 122). The section additionally provides that cost recovery settlements under subsection (h) are only authorized "for costs incurred by the *United States Govern-*

---

ing only on a theory of de minimis and cost recovery settlements.

**26.** The United States argues as amicus curiae that KDHE has no authority under its cooperative agreement with the EPA to enter into de minimis settlements on behalf of the federal government. ("Brief of the United States as Amicus Curiae," doc. 528). The government's argument is substantially similar to the City's argument.

**27.** Section 122(g) authorizes the "President [to] . . . reach a final settlement with a PRP in an administrative or civil action under section 9606 or 9607 of this title if such settlement involves only a minor portion of the response

costs at the facility concerned . . . ." 42 U.S.C. § 9622(g)(1). Section 122(g) authority has been delegated by the President to the Administrator of the EPA. *See* Exec. Order No. 12,-580, 52 Fed.Reg. 2923 (1987).

**28.** Section 122(h) provides, in part:

The head of any department or agency with authority to undertake a response action under this chapter pursuant to the national contingency plan may consider, compromise, and settle a claim under section 9607 of this title for costs incurred by the United States Government if the claim has not been referred to the Department of Justice for further action.

ment." 42 U.S.C. § 9622(h)(1) (emphasis added); *Waste Management of Penn., Inc. v. City of York*, 910 F.Supp. 1035, 1040 (M.D.Pa.1995) (stating that § 122(h) authorizes settlement of costs incurred by the United States government only). Parties who enter into cost recovery and de minimis settlements with the federal government are entitled to contribution protection. *See* 42 U.S.C. § 9622(g)(5), (h)(4).

■ The interrelationship between §§ 113 and 122 is critical. The limitation periods set forth in § 113(g)(3)(B) do not stand alone; their "triggering events" cannot occur in the absence of a settlement provided for in § 122. Section 122 pertains to settlements with the federal government. The federal government is not a party to the City/KDHE Settlement Agreement, the Coleman Consent Order or the City/Coleman Settlement Agreement, the alleged "triggering events." Joint defendants nevertheless assert that "The City/KDHE settlement is such an administrative order [as referred to in § 113]. KDHE has the authority on behalf of the President of the United States to issue orders such as are provided for in 42 U.S.C. § 9606 or conduct other 'enforcement actions.' As a result, the Administrative Order embodying the Settlement Agreement between the City and KDHE, made clear Tenth Circuit law, triggers the running of the statute of limitations." (Doc. 531 at 10).

There is no evidentiary support for this assertion. The City/KDHE Settlement Agreement does not give KDHE the authority to act for the federal government. Apparently recognizing this, joint defendants contend that the Cooperative Agreement between the EPA and KDHE authorizes the KDHE to act on behalf of the President to carry out "related enforcement actions" at the Site (among other sites). Unfortunately for joint defendants, the Cooperative Agreement expressly negates any authority on KDHE's part to act on the EPA's behalf in matters related to the Site. *See* doc. 532, Ex. C at 9–10, ¶ R ("[T]he State ... is not authorized to represent or act *on behalf of EPA* in any matter related to this Agreement."). Moreover, KDHE is prohibited from negotiating or settling claims the federal government may have with respect to the Site. (*Id.* at ¶ T ("Neither party to this Agreement shall attempt to negotiate for nor collect reimbursement of any response costs on behalf of the other party, and authority to do so is hereby expressly negated and denied."))

■ In their reply brief, joint defendants attempt to back away from the terms of the Cooperative Agreement and instead argue a state's power to enter into § 122 settlements is inherent under CERCLA § 104(d), 42 U.S.C. § 9604(d), when a cooperative arrangement exists. They contend that a state has statutory authority to "carry out related enforcement actions," 42 U.S.C. § 9604(d)(1), which includes the authority to enter into de minimis and cost recovery settlements under § 122. There is no statutory definition of "enforcement action" under CERCLA.

Joint defendants' reliance on § 104(d)(1) is unpersuasive for two reasons. First, joint defendants have not demonstrated through relevant legal authority that, by referring to "enforcement action" in § 104(d)(1), Congress intended states to be automatically vested with § 122 settlement power whenever a cooperative arrangement exists. Second, section 104(d)(1)(A) provides that the *terms* of the Cooperative Agreement *control*, which in this case expressly precludes KDHE's ability to act on behalf of the EPA.[29]

---

**29.** Joint defendants object (Doc. 540) to the affidavit of Rick Bean, offered by the City in opposition to summary judgment. Mr. Bean was KDHE's project manager at the Site from

The court therefore concludes that KDHE had no authority to enter into any de minimis settlement under § 122(g) or cost recovery settlement under § 122(h) under the terms of the Cooperative Agreement or § 104(d). Thus, the other agreements relied upon by joint defendants could not possibly have started § 113(g)(3)(B)'s time limitations. When no triggering event has occurred, and a contribution action is the "initial action," *Sun* unmistakably holds that § 113(g)(2)'s six-year period governs the time in which a party is entitled to seek contribution.

### C. *INITIATION OF CONSTRUCTION OF REMEDIAL ACTION AT THE SITE*

■ Having concluded that the three-year limitation period of § 113(g)(3) is inapplicable, the court must next address whether the City's contribution claims are barred by § 113(g)(2)(B)'s six-year limitation period. APCO defendants' and joint defendants' arguments on the issue are essentially indistinguishable. To sustain defendants' motions for summary judgment based on § 113(g)(2)(B), the court must find by undisputed facts that physical construction of the remedial action was initiated at the Site prior to October 1992, six years before this suit was brought. A prolix definition of "remedial action" is provided by CERCLA § 101(24), 42 U.S.C. § 9601(24). The core of the definition is that "remedial action" is action taken which is "consistent with" the particular remedy developed for a site. *See United*

States v. Navistar Int'l Transp. Corp., 152 F.3d 702, 712 (7th Cir.1998) (quoting from § 101(24)).

■ To satisfy their required showing, defendants allege that Coleman initiated physical on-site remedial action from July 1991 to March 1992 when the three groundwater recovery wells, two SVESs and two air stripping towers were installed at the CDWF.[30] Defendants argue installation of this equipment by *Coleman* triggered the *City's* time in which to seek contribution under § 113(g)(2)(B). Defendants make no claim that any City action within the Site triggered § 113(g)(2)(B). Consequently, they contend the latest point at which the City could have filed suit was in March 1998.

The City responds that Coleman's alleged remedial action cannot be attributable to it for purposes of determining whether § 113(g)(2)(B)'s six-year period was started. Alternatively, the City disputes that Coleman's work pursuant to the Consent Order constitutes "initiation of physical on-site construction" of remedial action.

#### 1. *Imputing Coleman's Actions to The City*

■ Defendants' arguments in support of their motions collapse if, as the City asserts, Coleman's activities at the Site cannot start the time in which it has to bring suit under § 113(g)(2)(B). Defendants' arguments are based merely on a

---

late 1990 through August 1994. Since August of 1994 he has supervised the Site project manager. Joint defendants object to specific paragraphs of Mr. Bean's affidavit in which they contend Mr. Bean offers legal conclusions and opinions on issues related to their statute of limitations defense. The objection is noted; however, the court places no reliance upon the paragraphs in Mr. Bean's affidavit to which joint defendants object.

**30.** Joint defendants also argue that Coleman's installation of power lines, piping and other hardware associated with this equipment constitute the initiation of remedial action. *See* doc. 531 at 21. None of the stipulated facts nor joint defendants' statement of facts identify that these items were installed. Summary judgment facts must be set forth in the statement of material facts with reference to the record. D. Kan. Rule 56.1. Because these are not, the court disregards them.

theory that one PRP's actions at a site ought to start *another PRP's* time in which to seek contribution; however, they offer no legal authority or legal analysis supporting the notion. The text of § 113(g)(2) certainly does not support defendants' theory. Given the purpose of statutes of limitations and CERCLA's response cost recovery scheme, it seems highly doubtful that Congress would have intended by unstated implication to foreclose one PRP's right to contribution based on remedial action taken by another PRP.[31] As other courts have recognized, CERCLA's statute of limitations "must be afforded a broad and liberal construction so as to avoid limiting the liability of those responsible for cleanup costs beyond the limits expressly provided." *United States v. Petersen Sand & Gravel, Inc.*, 824 F.Supp. 751, 755 (N.D.Ill.1991); *see also Atlantic Richfield Co. v. American Airlines, Inc.*, 98 F.3d 564, 570 (stating that CERCLA is remedial legislation that should be construed broadly). The court declines to impute Coleman's actions to the City. Defendants have put forth neither persuasive evidence nor argument that they have been prejudiced by the City's delay in bringing this action.

### 2. *Coleman's Initiation of Remedial Action*

There is no dispute that installation by Coleman of the groundwater recovery wells, SVESs and air stripping towers involved physical action at the CDWF. The question is whether Coleman's activities

constituted "initiation" of construction of the remedial action. The court concludes that they did not because the final remedy at the CDWF was not known when Coleman installed the equipment.

■■■■ KDHE has not approved the final remedy to be implemented at the CDWF, much less at the entire site. Approval of the final remedy at a site, however, is not the dividing line from which to determine whether remedial action has or has not begun. As the Seventh Circuit held, such a "bright-line" rule is contrary to Congress's broad definition of "remedial action" under § 101(24). *United States v. Navistar Int'l Trans. Corp.*, 152 F.3d 702, 712 (7th Cir.1998). The City argues, however, that "initiation" of "construction of the remedial action" cannot occur if the design of the final remedy has not been disclosed in some form. The court agrees.

The cases relied upon by defendants in support of their motions do not persuade the court otherwise. In *Navistar*, the United States and the State of Indiana filed a CERCLA action against Navistar on September 19 and 20, 1996, respectively. Both sought to recover cleanup costs for action taken at a Fort Wayne, Indiana landfill. An earlier suit had been brought by the governments in 1989 against SCA Services of Indiana (SCA), the owner of the landfill at that time. A consent decree between SCA and the governments was entered in July 1989, providing a time line for SCA's remedial action at the site. *See*

---

**31.** Statutes of limitations "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.' ... [T]hey protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories,

disappearance of documents, or otherwise." *United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979) (citations omitted). In short, "[s]tatutes of limitations are used to determine 'whether the plaintiff has inexcusably slept on his rights.' " *United States v. Northrop Corp.*, 91 F.3d 1211, 1217 (9th Cir.1996) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946)).

*id.* at 704. SCA submitted its final design documents to the EPA on September 11, 1990, received oral approval of the final design on September 14, 1990 and oral approval to proceed with construction of the remedial action on September 17, 1990. *See id.* at 705. Written approval was received on September 20, 1990. *See id.* The final remedy was therefore known on September 14, 1990.

SCA placed the first "lift" of clay necessary for a permanent clay cap on September 18, 1990. *See id.* The clay cap was a required part of the final remedy. Navistar argued SCA's first lift of clay after receiving permission from the EPA was the "initiation of physical on-site construction of the remedial action," and therefore, the governments' claims were barred by § 113(g)(2)(B) because they were filed over six years later. *See id.* at 712. The governments argued the claims were not barred because suit was brought within six years of the written approval. *See id.* The court rejected the governments' argument, noting that it was "undisputed" that remedial action at the site called for construction of a clay cap. *See id.* at 713. The court concluded therefore that the first "lift" of clay was the " 'initiation' " of 'construction' ... and " 'consistent with [the] permanent remedy.' " *Id.* Although there was no final approval in *Navistar*, the final remedy planned for the Site was ascertainable when the triggering action was taken.

Defendants also rely on *California v. Hyampom Lumber Co.*, 903 F.Supp. 1389 (E.D.Cal.1995). In *Hyampom*, the State of California filed suit on September 30, 1994 seeking to recover response costs it incurred cleaning up a former lumber mill. The California Department of Health began soil sampling at the site in the fall of 1987 and constructed a fence around a source area of contamination sometime between September 28 and October 5, 1987. *See id.* at 1390. The Department issued a draft remedial action plan on June 24, 1988 identifying excavation and removal of contaminated soil as the appropriate remedial response. A final remedial action plan was approved on October 19, 1988. In between the draft and final plan several activities occurred on the site, including the installation of a second fence, and installation of a lumber pole, electrical hardware, and water pipes. *See id.* at 1390–91. The defendants argued the installation of both fences and the utilities were the initiation of physical on-site construction of the remedial action under § 113(g)(2)(B). *See id.* at 1391.

The court rejected the argument that the first fence was remedial action for two reasons; 1) fencing is specifically listed in the definition of a "removal action" in § 101(23), and 2) the fence was installed nine months *before* the draft remedial action plan and while RI/FS testing was still ongoing. *See id.* at 1393. In contrast, the court concluded that installation of the utilities constituted "construction of the remedial action," noting that the utilities were installed for the sole purpose of implementing the chosen permanent remedy, which was apparent from the draft remedial action plan,[32] and marked the "initiation" of the final remedy. *See id.* at 1393–94. Again, in *Hyampom* the final remedy was reasonably known at the time the triggering action was taken. *See also Advanced Micro Devices v. National Semiconductor*, 38 F.Supp.2d 802, 813 (N.D.Cal. 1999) (recognizing in comparison to *Hyampom* that the final design had not been disclosed prior to the activities relied upon as remedial action).

---

**32.** The court noted based on the draft remedial action plan that utility service was a central part of the permanent remedy. *See Hyampom*, 903 F.Supp. at 1393.

 Based on these decisions, the court concludes that remedial action cannot be "initiated" within the meaning of § 113(g)(2)(B) unless the permanent remedy is disclosed with some certainty (although formal approval is not necessary) at the time the relied upon activity at a site is undertaken. Defendants make no such showing. Rather, they present evidence that, *as of 1999,* the final remedy at the entire Site will likely involve some form of "pump and treat."[33] (Doc. 531 at ¶ 46; Doc. 617 at ¶¶ 12 & 13). As an initial matter, the court does not find that the generic references in the record to "pump and treat" establish with any certainty what the final remedy will be at the Site. Additionally, the evidence is so vague as to what the final remedy will be that the court could not possibly determine on summary judgment whether previous action was consistent with the final remedy. On a substantive level, however, the fact that Coleman's activities in 1991 and 1992 may be consistent with the remedy ultimately approved by KDHE cannot form the basis for concluding that remedial action began in 1991 and 1992 when the equipment was installed at the CDWF. *See Advanced Micro Devices,* 38 F.Supp.2d at 813 (stating that early activities at a facility incorporated into the final remedy cannot be considered in hindsight as remedial action). In fact, the draft FS report *proposing* the use of the equipment, along with three other alternatives, was not even submitted to KDHE until June 1997 and KDHE has taken no action on it.

The equipment relied upon by defendants was installed in the early stages of investigation at the CDWF and was instrumental to the investigative activities. Because it fortuitously may be consistent with the final remedy chosen at the CDWF cannot form the basis for concluding that § 113(g)(2)(B) was triggered. The court therefore concludes the City's claims are not time-barred.

## V. CONCLUSION

Defendants' motion for summary judgment on the City's § 107(a) claims is sustained. Defendants' motion for summary judgment that the City's claims are barred by the statutes of limitation is overruled.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 5 pages and shall strictly comply with the standards enunciated by this court in *Comeau v. Rupp,* 810 F.Supp. 1172, 1174 (1992). The response to any motion for reconsideration shall not exceed 5 pages. No reply shall be filed.

IT IS SO ORDERED.

---

**33.** The evidence presented is not specific to the CDWF and appears to relate solely to the City's remedial activity to be undertaken.

The joint defendants contend in their reply that "KDHE has granted specific approval to proceed with the construction and operation of a remedial system for the [CDWF] during the pendency of the remedial investigation phase." (Doc. 534 at 4, ¶ 16). The portions of the record relied upon by the joint defendants do not support their assertion but establish only that KDHE approved findings of Coleman's remedial investigations during the four phases of investigation and the respective reports. (Doc. 533, Ex. O at ¶ R).